# EXHIBIT G

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF VIRGINIA
 2                   RICHMOND DIVISION

 3

 4  _____)
    UNITED STATES OF AMERICA           )
 5                                      )
                                        )
 6  v.                                  )    Criminal Case No.:
                                        )    3:23 CR 68
 7  SHRONDA COVINGTON, et al.           )
    _____)
                                             December 12, 2024
 8                                           Volume IV

 9         COMPLETE TRANSCRIPT OF TRIAL PROCEEDINGS
          BEFORE THE HONORABLE RODERICK C. YOUNG
10             UNITED STATES DISTRICT COURT JUDGE

11  APPEARANCES:

12  Thomas Arthur Garnett, Esquire
    OFFICE OF THE UNITED STATES ATTORNEY
13  919 East Main Street
    Suite 1900
14  Richmond, Virginia 23219

15  Katherine McCallister, Esquire
    UNITED STATES DEPARTMENT OF JUSTICE
16  Civil Rights Division
    150 M Street NE
17  Ste 7.924
    Washington, DC 20530
18
    Kathryn Elena Gilbert, Esquire
19  UNITED STATES DEPARTMENT OF JUSTICE
    Civil Rights Division
20  950 Pennsylvania Ave NW
    4025 NYA
21  Washington, DC 20530

22          Counsel on behalf of the United States

23

24              TRACY J. STROH, RPR
               OFFICIAL COURT REPORTER
25          UNITED STATES DISTRICT COURT
```

```
 1   APPEARANCES: (Continued)

 2   Fernando Groene, Esquire
     FERNANDO GROENE, PC
 3   364 McLaws Circle
     Suite 1A
 4   Williamsburg, VA 23185

 5   Melissa E. O'Boyle, Esquire
     GENTRY LOCKE
 6   101 W. Main Street
     Suite 705
 7   Norfolk, VA 23510

 8           Counsel on behalf of the Defendant
             Shronda Covington
 9

10   Robert J. Wagner, Esquire
     ROBERT J. WAGNER PLC
11   101 Shockoe Slip
     Suite J
12   Richmond, Virginia 23219

13   Jeffrey Lee Everhart, Esquire
     JEFFREY L. EVERHART, P.C.
14   4100 East Parham Road
     Suite C
15   Richmond, VA 23228

16           Counsel on behalf of the Defendant
             Tonya Farley
17

18   Charles David Whaley, Esquire
     LAW OFFICE OF C. DAVID WHALEY, LLC
19   100 W. Franklin Street
     Suite 301
20   Richmond, VA 23220

21   William Jeffrey Dinkin, Esquire
     WILLIAM J. DINKIN, PLC
22   101 Shockoe Slip
     Suite J
23   Richmond, VA 23219

24           Counsel on behalf of the Defendant
             Yolanda Blackwell
25
```

868

1                           **I N D E X**

2                           WITNESSES

3   Examination By:                                    Page

4                   BRANDY HUDSON
    Direct     - MR. GARNETT                           873
5   Cross      - MR. DINKIN                            906
    Cross      - MR. GROENE                            910
6   Cross      - MR. WAGNER                            932
    Redirect   - MR. GARNETT                           939
7               SHANTAE MOODY-MOORE
    Direct     - MS. GILBERT                           945
8   Cross      - MR. EVERHART                          973
    Cross      - MS. O'BOYLE                           978
9   Redirect   - MS. GILBERT                          1019
                LAKESHIA BARNES
10  Direct     - MR. GARNETT                          1025
    Cross      - MR. DINKIN                           1045
11  Cross      - MR. GROENE                           1051
    Redirect   - MR. GARNETT                          1074
12              JESSICA PRYOR
    Direct     - MS. MCCALLISTER                      1079
13  Cross      - MR. DINKIN                           1089
    Cross      - MR. WAGNER                           1090
14  Cross      - MS. O'BOYLE                          1097
    Redirect   - MS. MCCALLISTER                      1103
15              BRUCE NORMAN
    Direct     - MR. GARNETT                          1106
16  Cross      - MR. EVERHART                         1130
    Cross      - MS. O'BOYLE                          1140
17  Cross      - MR. WHALEY                           1163
    Redirect   - MR. GARNETT                          1179
18              TERRY KILPATRICK
    Direct     - MR. GARNETT                          1193
19


20                          EXHIBITS

21  Exhibit      Description                           Page

22  Government
    No. 17       WALTERS AN2_(73)-A-N (LS) Common       953
23               Area(73)_08Jan2021_235959_09Jan20
                 21_075959
24  No. 17A      WALTERS AN2_(73)-A-N (LS) Common       953
                 Area(73)_08Jan2021_235959_09Jan20
25               21_075959 - Clip 3.41.32-3.42.45

Shantae Moody-Moore - Direct                    945

1  quickly while that witness is coming in?

2              (The following was held outside the hearing of

3              the jury:)

4              THE COURT:  What's the order you want to cross

5  in?

6              MR. GARNETT:  Judge, Ms. Gilbert will be direct

7  examining.

8              THE COURT:  That's fine.  Hold on one minute.

9              MR. GARNETT:  I just didn't want to step on

10 toes.

11             THE COURT:  No.  No.

12             MS. O'BOYLE:  I think the order is going to

13 be -- I think Ms. Blackwell's lawyer is first and then I'm

14 going to go last.  I think it's Blackwell --

15             THE COURT:  Okay.

16             MR. GARNETT:  Shocker.

17             THE COURT:  Just confirm that with them --

18             MS. O'BOYLE:  Yeah.

19             THE COURT:  -- on the order, and that's how I'm

20 going to call it.  Okay?  All right.  Go ahead.

21             (The following was held in open court:)

22                      **SHANTAE MOODY-MOORE,**

23    called by the government, first being duly sworn,

24                   testified as follows:

25                   **DIRECT EXAMINATION**

Shantae Moody-Moore - Direct                946

1  BY MS. GILBERT:

2  Q    Good morning.

3  A    Good morning.

4  Q    Could you please state and spell your name for the

5  court reporter and anyone who would like to take notes.

6  A    My name is Shantae, S-H-A-N-T-A-E, Renee, R-E-N-E-E,

7  Moody, M-O-O-D-Y, hyphen, M-O-O-R-E.

8  Q    Thank you, Ms. Moody-Moore.

9        Ms. Moody-Moore, are you here today to tell the

10 jury about your interactions with Wade Walters and

11 Defendant Covington the day before Mr. Walters' death?

12 A    Yes.

13 Q    Who is your current employer?

14 A    My current employer is the Chesterfield Sheriff's

15 Office, and I am currently a warrant specialist.

16 Q    Did you previously work for the Bureau of Prisons?

17 A    I'm sorry.  Can you repeat that?

18 Q    Certainly.

19        Did you previously work for the Bureau of

20 Prisons?

21 A    Yes.

22 Q    Approximately when did you work for the Bureau of

23 Prisons?

24 A    On or about October 2020.

25 Q    Until when, approximately?

Shantae Moody-Moore – Direct                    947

1   A     Until about March of 2021.

2   Q     At which facility did you work?

3   A     I was located at FCC Petersburg.

4   Q     Back in January of 2021, what was your rank with the

5   Bureau of Prisons?

6   A     I'm sorry?

7   Q     What was your rank back in January 2021?

8   A     I was a regular correctional officer, known as just a

9   CO.

10  Q     Prior to working at FCC Petersburg, did you have

11  correctional experience?

12  A     Yes.

13  Q     Where was that?

14  A     My first location was at Georgia State Prison.

15  Q     And after that?

16  A     After that, I then started working with FCC

17  Petersburg.

18  Q     Did you also work at the Colorado State Prison?

19  A     Yes.

20  Q     Your husband is in the military, correct?

21  A     Prior military.

22  Q     Okay.  When you worked at the Georgia State Prison,

23  what was your role?

24  A     At Georgia State Prison, I was also a correctional

25  officer.  I was in charge of the administrative

Shantae Moody-Moore - Direct                948

1   segregation unit that held mental health individuals that

2   were on a 24-hour lock-down -- 23-hour lock-down, 1 hour

3   out.

4   Q    When you worked at Colorado State Prison, where in

5   the facility did you work?

6   A    I was also a correctional officer there, and I was in

7   charge of what they called the RP unit, which was

8   restricted privileges unit for individuals that needed a

9   little bit more help to abide by the rules of the

10  facility.

11  Q    Did you receive training to do those jobs before you

12  got to BOP?

13  A    Yes.

14  Q    I'd like to turn your attention back to January 9th,

15  2021, and what happened to Mr. Walters.  Were you working

16  that night?

17  A    Yes.

18  Q    What shift were you working that night?

19  A    I was on the shift called morning watch, which is

20  considered the 12 a.m. to 8 a.m. shift.

21  Q    I said "night," but I guess morning watch is what

22  it's called?

23  A    Yes.

24  Q    Where in the facility were you working that morning

25  watch?

Shantae Moody-Moore - Direct                    949

1    A    For morning watch, I was the officer for A-South and
2    A-North.
3    Q    Was that your usual shift?
4    A    Yes.
5    Q    How many officers worked the A units during that
6    shift?
7    A    During that shift, just one officer.
8    Q    Why is there only one officer in A unit at night?
9    A    I believe with the facility, it's because of the fact
10   that the individuals that we supervise there, they are --
11   at those hours, are behind closed doors.  They're locked
12   down for the rest of the evening.  The rec has been done,
13   feedings have been done.  So I believe that's the reason
14   why it's only one officer.
15   Q    It's a less busy time?
16   A    Yes.
17   Q    All right.  What were your usually duties as the A
18   unit officer during morning watch?
19   A    As the officer on morning watch, I would come in, go
20   to -- report to A South side, see the officer on duty,
21   have any pass-down from what happened on the previous
22   shift prior to me taking over.
23        After that, do a quick walk-around to ensure
24   that everything is okay and then prepare myself for what
25   we would call count time for our first morning count.

Shantae Moody-Moore - Direct                    950

1  Q     What is count?

2  A     Count time is where myself and another officer would,

3  together, walk through both units and count each

4  individual that is housed in that unit to ensure that they

5  are present, accountable and everything is good to go.

6  Q     Is it also part of count to make sure that the

7  inmates are alive and breathing?

8  A     Correct.

9  Q     If you do count and the numbers don't add up, what

10 happens?

11 A     They -- we would go into what they call emergency

12 count.  And an emergency count is for us to ensure the

13 accountability of those individuals we supervise, and if

14 they're unaccounted for, we have to go into emergency

15 count, which is a lock-down because we have to locate that

16 individual.

17 Q     So if count doesn't work, you have to do count again?

18 A     Correct.

19 Q     In your training and experience, what did you learn

20 about what an officer should do if an inmate is not

21 breathing?

22         MS. O'BOYLE:  Your Honor, I'm going to object to

23 lack of foundation.  I don't believe she's gone through

24 her training at Petersburg, Your Honor.

25         THE COURT:  Government.

1  BY MS. GILBERT:

2  Q    Did you receive training at Petersburg?

3  A    Yes, I did.

4  Q    In your BOP training, what did you learn about what

5  an officer should do if an inmate is not breathing?

6  A    Through my training at FCC Petersburg, we are to

7  respond.  We are to respond to the incident, find out

8  what's going on, relate any important information that is

9  needed to our immediate supervisor and proceed from there.

10 Q    Is it also an option to use your body alarm?

11 A    Correct.

12 Q    Under BOP policy and training, what should a

13 correctional officer do if an inmate is breathing but has

14 some other possible medical need?

15 A    We would have to, therefore again, contact our

16 immediate supervisor.

17 Q    When you weren't walking the floors on morning watch,

18 where were you usually posted?

19 A    I was usually posted in Alpha South duty officer --

20 duty office.  I'm sorry.

21 Q    Where was Mr. Walters' cell?

22 A    In Alpha North.

23 Q    When you were in your office, did you have access to

24 surveillance or anything like that?

25 A    No, ma'am.

Shantae Moody-Moore – Direct                    952

1  Q     And just one other question about count.  Two

2  officers did count, correct?

3  A     Correct.

4  Q     On January 9th, which other officer did count with

5  you?

6  A     For the morning count, it was Officer Barnes.

7  Q     Okay.  I want to talk about what happened during

8  count that night.  Did anything remarkable happen?

9  A     At the time of count, once -- prior to our initial

10 count, we started on the A-North side, and as we

11 approached Mr. Walters' and Mr. Southerland's cell, I was

12 informed that he had some concerns about --

13 Mr. Southerland had some concerns about his cellmate,

14 Mr. Walters.

15        I immediately then said, "Hold that thought.  I

16 will be back.  We have to conduct count, and I'll come

17 back to you."

18        And from there, we conducted count.

19 Q     Why did you tell him that you had to come back and

20 finish count first?

21 A     Because, again, with the count time, we have to get

22 our count conducted in a timely manner so that that way we

23 would not have to go into emergency count.

24 Q     Okay.  Had you dealt with Mr. Southerland before?

25 A     No.

Shantae Moody-Moore – Direct                    953

1  Q    Had you dealt with Mr. Walters before?

2  A    No.

3  Q    What was Mr. Southerland's demeanor at that point?

4  A    At that point he was calm.  He didn't seem like

5  anything was wrong with him at the moment, no.

6  Q    Okay.

7           MS. GILBERT:  At this time, Your Honor, I'd like

8  to move into evidence -- I don't believe there's going to

9  be on objection -- surveillance of the housing unit.  It's

10  Government's 17.

11          THE COURT:  All right.  If no objection, it will

12  be entered.

13          (Government Exhibit Number 17 was admitted.)

14          (Government Exhibit Number 17A was admitted.)

15          (Government Exhibit Number 17B was admitted.)

16          (Government Exhibit Number 17C was admitted.)

17          (Government Exhibit Number 17D was admitted.)

18          MS. GILBERT:  And if I could, Ms. Brandon, could

19  we please pull up 17A and publish that to the jury,

20  please?

21          MS. O'BOYLE:  Your Honor, I have no objection.

22  I just want to know if this is a video that starts -- is

23  the video the full video, is it all day until -- from

24  12 a.m. until when Mr. Walters was removed from his cell

25  at 7:30 p.m.?

Shantae Moody-Moore – Direct                    954

1           MS. GILBERT:  I think defense counsel has all

2    the time stamps and the government's exhibit list so I'm

3    not sure I track the question.

4           Exhibit 17 is from just before midnight on

5    January 8th to 8 a.m. on January 9th.  As defense counsel

6    knows, there is no video, at least that is on anyone's

7    exhibit list, that shows the entire time he was in the

8    housing unit, as far as I'm aware.

9           MS. O'BOYLE:  Your Honor, that's -- what I'm

10   trying to find out is her -- is her exhibit just the

11   snippet or is it the full video?  Because actually, the

12   full video of that entire time is on defense counsel's

13   list, and then we made separate clips based on that and

14   we'll move those in.  I'm just trying to figure out if

15   this is the full video or if it's a clip of the video.

16          THE COURT:  I think she said it's from 12 a.m.

17   to 8 p.m., or something.

18          MS. GILBERT:  Yes, Your Honor.  As identified on

19   the government's exhibit list, that's 17, and then 17A is

20   a clip of that video.  We've just moved to admit 17.  So

21   the jury will have that, and we're asking to play a clip

22   now.

23          THE COURT:  And then you're asking to play a

24   clip, which is another exhibit, correct?

25          MS. GILBERT:  Yes, Your Honor.  It's a part of

Shantae Moody-Moore – Direct                    955

1   Exhibit 17.

2              THE COURT:  All right.  Is there any objection

3   to that?

4              MS. O'BOYLE:  There is no objection.  Thank you.

5              THE COURT:  All right.  It will be entered.

6              MS. GILBERT:  Thank you.

7   BY MS. GILBERT:

8   Q    Ms. Moody-Moore, you've previously seen some of the

9   surveillance footage from the housing unit, correct?

10  A    Correct.

11  Q    Okay.  I'd like to play some of that now.

12             MS. GILBERT:  If we could go ahead with that,

13  Ms. Brandon.

14             THE COURT:  Is the system switched to them?  Is

15  the audio-video system switched to the government?

16             THE CLERK:  It is.

17             THE COURT:  Okay.

18             MS. GILBERT:  I think we're going to be starting

19  at 3:41:32 on January 9th, 2021.

20             (Video Played.)

21             MS. GILBERT:  I think we can stop there.  Thank

22  you, Ms. Brandon.

23             We're going to pause at 3:42:40 a.m. on

24  January 9, 2021.

25  BY MS. GILBERT:

Shantae Moody-Moore - Direct                    956

1    Q    Officer Moody-Moore, does that show the encounter we

2    just described?

3    A    Yes.

4    Q    There are two officers there.  Which two officers do

5    you believe are there?

6    A    Myself and Officer Barnes.

7    Q    Okay.  And when you were shining the flashlight in

8    the cells, what were you doing there?

9    A    I was checking to make sure accountability, that two

10   people were in the cell, or however many were present in

11   the cell.

12   Q    Okay.  At that time of night, just looking at this

13   video and in your experience, did the inmates typically

14   have their lights off?

15   A    Yes, because at that time at night, a lot of the

16   inmates, they are as sleep.

17   Q    Was Mr. Walters' light on?

18   A    Yes.

19   Q    And one of you, it looked like, stayed back at the

20   cell a little bit.  Could you tell which officer that was?

21   A    That was Officer Barnes.

22   Q    Okay.

23        MS. GILBERT:  And we can take that down.  Thank

24   you, Ms. Brandon.

25   BY MS. GILBERT:

1  Q     What did you do after this?

2  A     After that encounter, we continued on with the rest

3  of the unit count.  After that, I did go to the middle of

4  the unit to use that telephone that's located in the

5  middle of the unit to call the control center to report my

6  count that I had for A-North unit.

7              Then after that, I ended up going back to

8  confirm count, that my count was accurate.  Then after

9  that, I did proceed back to Mr. Walters' and

10 Mr. Southerland's cell to further assess the situation.

11 Q     Okay.  When you got back to Mr. Walters' and

12 Mr. Southerland's cell, what did you observe?

13 A     Once I got back to the cell, I did observe that

14 Mr. Walters was pacing back and forth.  He was pacing back

15 and forth.  His hair was kind of like disheveled.  He had

16 what appeared to be, like, some chewed up white toilet

17 paper stuck in part of his hair.  I also noticed some red

18 coloration on the floor and some ripped open packets of,

19 like, the Kool-Aid that we used to issue out to them, just

20 spread over the floor.

21              That's what I noticed when I first initially

22 went back to the cell.

23 Q     You described Mr. Walters pacing.  Can you describe

24 how he was moving?

25 A     He was moving in -- how can you explain it? -- in a

Shantae Moody-Moore – Direct                958

1  slow manner.  He was walking back and forth from the back

2  of the cell, from the window, back to the door where I was

3  standing, going around in circles, back and forth, back

4  and forth.

5  Q    At that point did you also see wetness on the floor?

6  A    Yes.

7  Q    Did you come to learn what that was?

8  A    Later I did find out that it was possible urine on

9  the floor.

10 Q    Okay.  Did you speak with Mr. Southerland again at

11 that point?

12 A    Yes, I did.

13 Q    What did Mr. Southerland tell you?

14 A    At that point in that interaction he did inform me

15 that his -- he was concerned about Mr. Walters.  He said

16 that he was lying in the bed at one point and Mr. Walters

17 was just standing over top of him, just staring at him,

18 and he was concerned about his cellie's well-being.

19 Q    Did he describe any of Mr. Walters' behaviors other

20 than the standing over him and staring at him?

21 A    Yes.  He just mentioned that -- of course, what I

22 observed; that he had opened up Kool-Aid packets, put them

23 all over the floor.  He had urinated on the floor.  He was

24 chewing up paper and eating apples, an apple out of the

25 trash can.

1    Q    He said -- Mr. Southerland said that Mr. Walters was

2    eating out of the trash can?

3    A    Yes.

4    Q    Okay.  At that point did Mr. Southerland say anything

5    about whether he believed Mr. Walters needed medical

6    attention?

7    A    He did -- and was worried about -- he stated that he

8    was worried about the well-being of Mr. Southerland and

9    that he did, in the past, have mental health issues is

10   what he explained to me.

11   Q    Mr. Southerland said he was worried about the

12   well-being of Mr. Walters?

13   A    Mr. Walters, correct.

14   Q    And Mr. Southerland also said Mr. Walters previously

15   had mental health issues?

16   A    Correct.

17   Q    Okay.  I just wanted to clarify that.

18        Did you try to talk with Mr. Walters?

19   A    Yes, I did try to talk to Mr. Walters once I was able

20   to kind of get him to stop pacing back and forth.  So he

21   came to the cell door, and as I'm asking him questions,

22   saying, "Mr. Walters, are you okay?  Is everything --

23   what's going on," trying -- he was talking, but no words

24   were coming out of his mouth.  So his mouth was moving but

25   verbally no sound at all.

Shantae Moody-Moore – Direct                    960

1  Q    Did Mr. Southerland say anything about whether this

2  was unusual behavior about Mr. Walters?

3  A    Yes.  I did ask Mr. Southerland if this has happened,

4  because I was unfamiliar with Mr. Southerland and

5  Mr. Walters as I never actually had any problems or

6  issues, interactions with them before.  So I was unaware

7  of Mr. Walters' situation.  But he did state that this was

8  out of the ordinary for Mr. Walters to behave like this.

9  Q    What did you tell Mr. Southerland you were going to

10  do?

11  A    So I did tell Mr. Southerland, I said, "What I need

12  you to do is keep your light on, press the duress button

13  in your cell if you need me.  I am going to the office and

14  I'm going to contact my lieutenant."

15  Q    During morning watch, how many lieutenants are at the

16  facility?

17  A    From my knowledge, I believe it's only one lieutenant

18  that I'm aware of.

19  Q    Who was your shift lieutenant that night?

20  A    That night was Lieutenant Covington.

21  Q    Did you call Lieutenant Covington?

22  A    Yes, I did.

23  Q    Why did you call Defendant Covington?

24  A    I called Lieutenant Covington because of what I

25  observed going into the cell.  I am not a medical

Shantae Moody-Moore - Direct                961

1  professional and I was unaware or unfamiliar with

2  Mr. Walters' situation, and then learning that he's had

3  mental health issues in the past, I just wanted to be

4  better prepared for my shift of what was going on.  I

5  didn't know how to proceed with the situation.

6          On top of that, it's 12 -- it's early in the

7  morning.  I'm the only officer there.  We're not supposed

8  to open the cell doors without some type of backup or

9  anything.  So therefore, my next order of operations was

10 to call my lieutenant, operations lieutenant.

11 Q    Okay.  What did you say to Lieutenant Covington when

12 you called her?

13 A    On the initial phone call, I did state to her what I

14 observed, what was relayed to me by Mr. Southerland.  Once

15 I stated that, I asked if there was any way to get him

16 removed from the cell.

17         It was then stated to me by Lieutenant Covington

18 he could not be removed because it was positive cases

19 within Alpha North unit, positive COVID cases.

20         Within Alpha North, we had cells -- and

21 throughout the facility -- that had paperwork on the door

22 stating that this cell has tested positive for COVID.

23 Some did not if they did not test positive for COVID.

24 Mr. Walters' and Mr. Southerland's cell in particular did

25 not have a sign stating that anyone tested positive in

1  that cell.

2          So when I relayed the information about

3  everything that I observed, asking to see if he could get

4  possibly removed because I was -- I was worried, not sure

5  what would possibly go on on my shift, the response I got

6  was no because the unit has positive cases in there.  And

7  I again reiterated that their cell did not have an active

8  positive case.

9          It was also stated to me on that phone call

10  that -- I said, "Can he see medical?"

11          I was told that there was no medical there, that

12  they were on call and that she -- the part of the

13  conversation was that I will be coming into your unit.

14  That's the end of that phone call.

15  Q    Okay.  So just to clarify, when you called Defendant

16  Covington and asked her for help, she told you she would

17  come to the unit and help you?

18  A    Correct.

19  Q    You said that you told Lieutenant Covington what was

20  going on with Mr. Walters.  Did you tell Lieutenant

21  Covington that Mr. Walters was unable to talk?

22  A    Yes.  I relayed every single thing that I observed

23  and what was relayed to me from Mr. Southerland in that

24  initial contact of mine.

25  Q    Did you tell Defendant Covington that Mr. Walters was

1  eating out of the trash can?

2  A    Yes.

3  Q    And I think you said this already, but you asked that

4  he receive some medical help, correct?

5  A    Yes.

6  Q    Okay.  You talked about COVID protocols.  Had you

7  seen other inmates on units that had positive COVID cases

8  be removed from their cells for various reasons during

9  COVID?

10  A    Yes.

11  Q    Did COVID change whether inmates who needed medical

12  attention should be taken out of their cells?

13  A    It did slightly change.  The only change that I

14  noticed was how we proceeded and interacted with those

15  individuals that had COVID, putting on our PPE, or our

16  protection equipment, while we assist them.

17  Q    What was Defendant Covington's demeanor during this

18  first phone call?

19  A    The first phone call for me was it was -- I would say

20  her demeanor was more like irritated, maybe that she was

21  irritated or did not want to be bothered.  It didn't seem

22  that what I was saying was serious enough per that

23  conversation.

24  Q    What did you do after you spoke with Defendant

25  Covington?

1  A    So after the first initial phone call, I did leave

2  the office because I did notice again that I seen the

3  Kool-Aid spills and wet stuff inside the --

4  Mr. Southerland's and Mr. Walters' cell, because -- I'm

5  sorry.  At that -- also part of that conversation, I did

6  inform Mr. Southerland that I would get him some cleaning

7  so he can clean up the spills.

8            So I did proceed back to his cell and give

9  cleaning supplies to him to clean up the red Kool-Aid, the

10  urine and so forth.

11  Q    At some point did you move your things from the

12  A South office to sit near Mr. Walters' cell?

13  A    Yes.  I also did -- I did report back to my side that

14  I normally would have to sit on, which is Alpha North,

15  retrieved my personal items, lunch bag, so on, and walked

16  back to A South and stayed stationary on A South side for

17  the rest of that night.

18  Q    Was that something you had ever done before?

19  A    No.

20  Q    While you were waiting for Defendant Covington to

21  respond to the housing unit as she said she would, did you

22  have the opportunity to continue observing Mr. Walters?

23  A    Yes.

24  Q    Did he continue exhibiting the same symptoms?

25  A    Yes.

Shantae Moody-Moore - Direct                965

1  Q     At some point did you see Mr. Walters fall?

2  A     Yes.

3  Q     Can you explain how that came about?

4  A     So as I'm continuing to observe from walking the

5  Alpha North unit, I ended up going back to Mr. Southerland

6  and Mr. Walters' cell, just to check in again on them.  As

7  I'm standing there observing, I just said, hey, let me try

8  and see if he's going to be responsive this time.  Am I

9  going to get, like, any words coming out?  I proceeded to

10 talk to him.  Still same demeanor.  I instructed him to go

11 sit down on the bed.

12        As I'm instructing him to go sit down on the

13 bed, it appears that he understood what I was saying

14 because from facing me, he turns around and walks to the

15 back of the cell toward the window, and I'm thinking he's

16 about to go sit on the bed, but instead he sits on the

17 little mini trash can that they have in the cell.  He sits

18 on that and he falls over.

19        Upon -- when he falls, his head hits the toilet

20 seat that's in there, but he immediately got back up and

21 started walking and pacing, walking and pacing.  After

22 noticing and observing that, I asked Mr. Southerland, I

23 said, "Hey, is there -- is he bleeding?  Do you see

24 anything wrong?  Can you let me know, please?"

25        And he was like, "I don't see anything."

Shantae Moody-Moore – Direct                    966

1          So, of course, I didn't see anything,

2   Mr. Southerland didn't.  There wasn't anything visible

3   that I could see that was alerting, and then he continued

4   to pace and walk back and forth.

5   Q    Okay.  Why did you tell Mr. Walters to sit down on

6   the bed?

7   A    Because I just wanted him to be still.  I just wanted

8   him to -- because, again, I'm not a medical professional.

9   I didn't know what was going on.  I just wanted him to sit

10  still and didn't want to possibly later down the line have

11  Mr. Southerland more like worried of what he may or may

12  not do.  I just wanted him to sit still.  And then also to

13  see if he was going to react to what I actually said.

14  So --

15  Q    You're not a medical professional, but what can

16  happen to someone if they fall and hit their head?

17             MS. O'BOYLE:  Objection.  Calls for speculation.

18             THE COURT:  Sustained.

19             MS. GILBERT:  Your Honor, I would like to ask

20  just her common sense perspective or her BOP training and

21  policy perspective.

22             THE COURT:  You can rephrase.

23             MS. GILBERT:  Thank you, Your Honor.

24  BY MS. GILBERT:

25  Q    In your training and experience both as a

Shantae Moody-Moore - Direct

1  correctional officer and just in your life, what can

2  happen to someone who falls and hits their head?

3  A    From my experience, it can be internal bleeding.

4  That's just what I know.  Just because I didn't see any

5  outer bruises or anything, I don't know what's going on

6  internal.  We can bleed internally.  So that's what I

7  would assume possibly could happen.

8  Q    Okay.  Did you have the authority to open the door to

9  get a closer look at Mr. Walters?

10  A    No.

11  Q    Did you have the authority to leave the housing unit

12  to go get help for Mr. Walters?

13  A    No.

14  Q    Did you have any options besides calling your

15  supervisor, Defendant Covington, a second time?

16  A    No.

17  Q    To be clear, by that point had Defendant Covington

18  responded to your first call for help?

19  A    No.

20  Q    Who watched Mr. Walters while you went to call

21  Defendant Covington a second time?

22  A    If I recall correctly, it was Officer Pryor.

23  Q    What was Pryor's post that night, if you know?

24  A    She was Bravo South and Bravo North unit officer.

25  Q    How did it come about that Officer Pryor watched

1  Mr. Walters while you went to call Defendant Covington?

2  A    If I recall correctly, I did end up contacting her to

3  come down to keep watch while I conducted the second phone

4  call.

5  Q    Okay.  What did you say during the second phone call?

6  A    So on the second phone call to Lieutenant Covington,

7  I did also let her know what I observed this time about

8  him still pacing, still not speaking in words, the fall

9  from the trash can, the bumping of his head, and then

10 again reiterated, "Is there something we can do?  Can we

11 get him out of here, whether it's medical transport or

12 suicide watch?"

13        At that conversation, while I was at that cell,

14 the second time prior to the phone call with Lieutenant

15 Covington, I was made aware by Mr. Southerland that

16 Mr. Walters not only, of course, had mental health issues

17 in the past, but he also has been on suicide watch before.

18        So that's what prompted me this time, the

19 conversation, to mention possible suicide watch.  Again,

20 she reiterated he cannot be removed from the cell due to

21 positive cases being in Alpha North.

22        I then said okay.  Me, myself, getting a little

23 frustrated, irritated because now I'm witnessing this,

24 then she proceeded to ask me about his mental health --

25 not mental health, I'm sorry -- his reg numbers, which is

Shantae Moody-Moore - Direct                      969

1  their registration number.

2          So she asked me for Mr. Walters' and

3  Mr. Southerland's registration number.  And in my head,

4  when she asked that, it was after the fact of me telling

5  her that, hey, again, he has been on suicide watch that

6  I'm aware of and has mental health.  That was for her to

7  be able to possibly look up his mental health there at the

8  facility so she can know, I guess, his level of mental

9  health issues.  And that was the phone call.  Again --

10 Q    What did Defendant Covington say that she would do

11 during this second phone call?

12 A    The second phone call, again, she would come into the

13 unit.

14 Q    Did Defendant Covington say anything about whether

15 she was going to call the on-call physician?

16 A    No.

17 Q    What was Defendant Covington's demeanor during this

18 second phone call?

19 A    Again, it was, for me, unbothered, no -- no -- it was

20 just unbothered.  Like it was no urgency to the situation.

21          THE COURT:  Three minutes.

22          MS. GILBERT:  Three.  Thank you.

23 BY MS. GILBERT:

24 Q    You talked about Mr. Walters' history and what his

25 cellmate told you.  Did you at any point see Mr. Walters

Shantae Moody-Moore – Direct                          970

1   threaten to harm himself?

2   A    No.

3   Q    Did you tell someone else about your conversations

4   with Defendant Covington?

5   A    If I recall correctly, I did, of course, speak to

6   Officer Pryor because she was there standing watch while I

7   talked to Lieutenant Covington, and I believe was Officer

8   Barnes on that night as well as she was one of the first

9   ones that interacted with me.

10  Q    Did Defendant Covington ever show up to the unit?

11  A    No.

12  Q    Did Defendant Covington ever call you back to see how

13  you were doing?

14  A    No.

15  Q    Did Defendant Covington ever call you back to check

16  on how Mr. Walters was doing?

17  A    No.

18  Q    Did Defendant Covington ever call you back for a

19  different reason?

20  A    Yes.

21  Q    What did she call you back about?

22  A    So she did call back, and this was to inform me that

23  I was mandated.

24       And what I mean by mandated means that we had

25  someone that called in and someone -- an officer needed to

Shantae Moody-Moore - Direct                    971

1   stay over.  Once she told me that she was mandated, I did

2   inform her, I said, "I won't be" -- basically telling her

3   I wasn't going to be mandated tonight because I was

4   already on a 16-hour shift.

5   Q    Did she also say anything to you with respect to her

6   rounds records?

7   A    She did also --

8           MS. O'BOYLE:  Objection as to the leading,

9   Your Honor.

10          MS. GILBERT:  Your Honor, I have three minutes.

11  I'm just trying to move along.

12          MS. O'BOYLE:  Your Honor, it's still leading,

13  and everybody in this -- on this side knows what the

14  requirements are.

15          THE COURT:  You can rephrase.  Go ahead.

16  BY MS. GILBERT:

17  Q    What else did Defendant Covington say during this

18  phone call?

19  A    Outside of the mandate, she did ask me to put her in

20  the system for a round.

21  Q    Had Defendant Covington done her rounds that night?

22  A    No.

23  Q    Had she ever come to the unit for any reason that

24  night?

25  A    No.

Shantae Moody-Moore – Direct                972

1  Q    Would it have been true and accurate for you to enter

2  a record saying that she had been there?

3  A    No.

4  Q    You were later -- what time were you relieved that

5  day?

6  A    I was relieved at 6 a.m.

7  Q    Who relieved you?

8  A    Officer Hudson.

9  Q    Did you tell her what was going on with Mr. Walters?

10 A    Yes.  I relayed all the information of my experience

11 through that night with her and asked her to try to seek

12 help from her lieutenant that was on their shift for

13 Mr. Walters.

14 Q    When you left work at 8 a.m., where was Mr. Walters?

15 A    Mr. Walters was still in A-North -- A-North cell

16 where I was monitoring him the whole night.

17 Q    Did you later come back on shift that day?

18 A    Yes.  I did come back in at 4:00 for -- doing a

19 double, another 16-hour shift.  At that time, 4:00, I was

20 also again Alpha South and Alpha North unit officer.  So

21 for that shift, it was going to be 4:00 to the 12 and then

22 I would work my 12 to 8:00.

23           THE COURT:  Last question.

24           MS. GILBERT:  Thank you.

25 BY MS. GILBERT:

Shantae Moody-Moore – Cross                973

1    Q    Other than this situation with Mr. Walters, have you

2    at any point in your correctional career, whether at a

3    federal or state facility, had a situation where you asked

4    your superior officer to get medical care for an inmate

5    and your superior officer failed to provide that?

6    A    No.

7              MS. GILBERT:  Thank you, Ms. Moody-Moore.

8              THE COURT:  All right.

9              Ms. Blackwell, any questions?

10             MR. WHALEY:  No, Your Honor.

11             THE COURT:  All right.

12             Mr. Everhart, any questions?

13             MR. EVERHART:  Yes, Your Honor.  Thank you.

14                       **CROSS-EXAMINATION**

15   BY MR. EVERHART:

16   Q    Ms. Moody-Moore, good morning.

17   A    Good morning, sir.

18   Q    I'm Jeff Everhart.  I represent Tonya Farley, who is

19   here to your left.

20             A couple things.  As I understand your testimony

21   today, during the second phone call that you placed to

22   Lieutenant Covington, you mentioned that perhaps

23   Mr. Walters should be on suicide watch.  Is that accurate?

24   A    Suicide watch and/or a medical transport.

25   Q    Yes, ma'am.  Yes, ma'am.  One or the other?

Shantae Moody-Moore - Cross                      974

1  A    Yes.

2  Q    And you did that based on the fact that you knew

3  Mr. Walters had been on suicide watch on occasions before

4  that?

5  A    Not based solely off of that.  It was based off of

6  what I observed that night.

7  Q    Yes.  But part of the reason for -- okay.  Okay.

8  Fair enough.

9          Now, at some point subsequent to -- some point

10 after January 9th and January 10th, you handwrote some

11 notes.  Do you recall that?

12 A    Yes.

13          MR. EVERHART:  Gwen, would you be kind enough to

14 put up Bates 436 and 437, please?

15          MS. O'BOYLE:  We have at 87, if you'd like.

16          MR. GROENE:  We have it if you want.

17 BY MR. EVERHART:

18 Q    You should be able to see on screen.  Do you see

19 those?  There's actually one there, Ms. Moody-Moore.

20          I'm also going to ask that you be handed, ma'am,

21 a paper copy.

22 A    Okay.  Thank you.

23 Q    I'm a paper guy.  It's easier for me to read, but

24 whichever is better for you.  I'm just going to ask and

25 draw your attention to them.

1   A    Okay.  Thank you.

2   Q    Do you recognize those two pages?

3   A    Yes.

4   Q    Are those, in fact, handwritten notes that you

5   yourself wrote?

6   A    Yes.

7   Q    You recognize your handwriting?

8   A    Correct.

9   Q    Do you recollect on what date you made those notes?

10  A    If I'm not mistaken, it was on the night of in my

11  pink notebook.

12  Q    Okay.  So when it says, at the beginning, "On

13  January 9, 2021, at approximately 3:30," and it goes on,

14  you think you penned those notes later that evening during

15  the, I guess, 4 to midnight shift that you came back on?

16  A    No.

17  Q    Oh, you think you penned them before you left at

18  6 a.m.?

19  A    Before I left.  It was on my shift of morning watch.

20  Q    So these notes are, in essence, contemporaneous?

21  They happened at the same time basically of the incidents?

22  A    It didn't happen at the same time of the incidents.

23  It happened throughout the course of that night.

24  Q    Darn close.  Okay.  Perfect.

25            Now, on the second page of the handwritten, I

Shantae Moody-Moore - Cross                    976

1  quote, "He then picked up a razor out the window and start

2  playing with it, and the cellie then took it and slid it

3  under the door to Officer Pryor."  Did I read that

4  correctly?

5  A    Yes, you did.

6  Q    That is, in point of fact, what you observed?

7  A    No.  That is what was relayed to me by Officer Pryor

8  when I reported back to the cell after my second phone

9  call with Lieutenant Covington while she stood watch.

10 Q    That's what Pryor told you?

11 A    That's what was related to me.

12          MR. EVERHART:  Okay.  Perfect.  Thank you very

13 much.

14          That's all the questions I have, Your Honor.

15          THE COURT:  Thank you.

16          Ladies and gentlemen, we're going to take our

17 morning recess now and then we will return in about ten

18 minutes and continue with this witness' cross.

19          So, again, as I've informed you in the past and

20 will inform you again, please do not discuss the case

21 until it's submitted to you.  Please do not discuss the

22 case either among yourselves or with anyone else.  Don't

23 do any outside research, and we will see you back in about

24 ten minutes.

25          (The jury exited the courtroom.)

Shantae Moody-Moore - Cross                977

 1            THE COURT:  All right.  We'll stand in recess.
 2   You'll have 55 minutes.
 3            MS. O'BOYLE:  I'm sorry, Your Honor?  How much
 4   time?
 5            THE COURT:  Fifty-five.
 6            MS. O'BOYLE:  Thank you.
 7            MS. KOZAIN:  All rise.  This court stands in
 8   recess.
 9            MR. GROENE:  Judge, will you admonish the
10   witness not to discuss her testimony?
11            THE COURT:  Yes.
12            You are not to discuss your testimony with
13   anyone while -- you know, until your examination is
14   finished.  So you're not to discuss your testimony with
15   anyone right now.
16            THE WITNESS:  Yes, sir.
17            THE COURT:  Thank you.  You may step down if
18   you'd like.
19            And, Mr. Whaley, can I see you right here for a
20   second, you and Mr. Dinkin?
21            (Recess from 10:59 a.m. until 11:14 a.m.)
22            THE COURT:  Let's get Ms. Moody-Moore back and
23   then we will get our jury.
24            All right.  We can have our jury.
25            (The jury entered the courtroom.)

Shantae Moody-Moore – Cross                    978

1            THE COURT:  All right.

2            All right.  Counsel for Ms. Covington, any cross

3   of Ms. Moody-Moore?

4            MS. O'BOYLE:  Yes, Your Honor.  Thank you.

5            And, Your Honor, may I have my phone just to

6   keep a stopwatch?

7            THE COURT:  Sure.

8            MS. O'BOYLE:  Thank you.

9            Ms. Jones, can you switch this over to

10  defendant?

11           THE CLERK:  Yes.

12                    **CROSS-EXAMINATION**

13  BY MS. O'BOYLE:

14  Q    Good morning, Ms. Moody-Moore.

15  A    Good morning.

16  Q    Let me start here.  You really don't like

17  Ms. Covington, correct?

18  A    That's incorrect.

19  Q    Okay.  So in the five months you worked at

20  Petersburg, you complained about Ms. Covington, right?

21  A    Her work ethic.

22  Q    Okay.  You complained about the way she did her job?

23  A    Again, her work ethic.

24  Q    You did not like a woman who supervised you who had a

25  smug attitude?

Shantae Moody-Moore - Cross                    979

1   A    Again, incorrect.  Her work ethic.

2   Q    Well, do you remember talking -- having an interview

3   with Special Agent Anya Whitney back on September 29th of

4   2021?  Do you remember that?

5   A    I don't remember that date exactly.

6   Q    Okay.  But you remember having an interview with

7   Special Agent Whitney?

8   A    Yes.

9   Q    She recorded it?

10  A    Yes.

11  Q    And you remember telling her at that time that you

12  thought your supervisor had a smug attitude?

13  A    Which she did.

14  Q    Okay.  And you really didn't like that, right?

15  A    I'm sorry.  Repeat that.

16  Q    You really didn't like her smug attitude, correct?

17  A    Again, with her work ethic, no, I did not.

18  Q    And, in fact, you actually hated Ms. Covington

19  because she mandated you, right?

20  A    That's incorrect.

21  Q    Okay.  In fact, you started taking it upon yourself

22  to sign up for overtime shifts so that she couldn't

23  mandate you, right?

24  A    That is correct.

25  Q    And you signed up for that extra shift simply so that

1    you could tell Ms. Covington that she could not mandate

2    you?

3    A    That is correct.

4    Q    Right.  And you hated working with Ms. Covington so

5    much that you quit your job after only five months?

6    A    That is incorrect.

7    Q    Okay.  Well, you didn't blame her for why you had to

8    quit your job?

9    A    That's incorrect.

10   Q    So do you remember talking with Special Agent Anya

11   Whitney on September 29th of 2021?

12   A    I remember having a conversation with her, yes.

13   Q    Okay.  And you remember telling her at the time that

14   you told folks, "If you are going to keep me on morning

15   watch and keep me under her supervision, I don't want to

16   be here so I would rather just leave"?

17   A    I may have said those words.

18   Q    Okay.  May have or you did?

19   A    I may have.

20   Q    Okay.  But in January 2021, you did not write a memo

21   about your interactions with Mr. Walters at the direction

22   of anyone at the facility, right?

23   A    I'm sorry.  Can you repeat that?

24   Q    Yeah, it was a convoluted question.

25              You did not complain or -- what you talked to

1  the jury about today, you never said that to anyone of

2  authority at BOP in January of 2021 when this happened?

3  A    No, I did not.

4  Q    And you also did not report this in February of 2021,

5  right?

6  A    I reported it when I was contacted about the

7  incident.

8  Q    And you were contacted about it with Mr. Norman,

9  Bruce Norman?

10 A    Correct.

11 Q    Actually, the first time you reported this was when

12 you were on your way out of the door, and you reported to

13 Associate Warden Wilson?

14 A    That is incorrect.

15 Q    You didn't tell Associate Warden Wilson what you were

16 quitting your job because of Ms. Covington's mistreatment

17 of you?

18 A    I do not recall that happening.

19 Q    Do you recall meeting with Associate Warden Wilson?

20 A    I do not recall that meeting with Mr. Wilson.

21 Q    Okay.  And you don't recall talking -- you do recall

22 talking with Bruce Norman?

23 A    Via replying the message that was sent to me about

24 the incident.

25 Q    Okay.  What did Mr. Norman send to you?

Shantae Moody-Moore - Cross                    982

1  A    I can't recall what the e-mail actually entailed.

2  Q    Okay.  Well, let's take a look at Covington

3  Exhibit 88.

4         MS. O'BOYLE:  Just for the witness, please.

5  BY MS. O'BOYLE:

6  Q    And this is your e-mail, correct, that you sent on

7  April 11th, 2021?

8  A    Okay.  There we go.

9         Yes, this appears to be what I wrote, yes.

10 Q    And I can scroll down a little bit and make it a

11 little bigger too.  I don't want you to -- do you see

12 that?

13 A    Yes.  This -- this looks correct.

14 Q    Okay.

15         MS. O'BOYLE:  Covington moves in Exhibit 88.

16         THE COURT:  Any objection?

17         MS. GILBERT:  Your Honor, I would object on the

18 basis that this is the witness' prior statement.  I

19 believe she can be asked about it.  I believe that if she

20 denies things in it, she can be impeached with it.  I'm

21 not sure how it would come in as substantive evidence.

22         MS. O'BOYLE:  This is actually a business record

23 related to the office.  It's also her initial complaint,

24 and it is -- it is ultimately attached to the record in

25 the OIG referral of Ms. Covington.  So it comes in in two

Shantae Moody-Moore - Cross                    983

1  ways, Your Honor.

2          This is her prior statement.  I'm not offering

3  it for its truth.  That's for sure.  But it is -- it is

4  a -- an e-mail to Bruce Norman that was her first

5  complaint on April 11th of 2021, after she had already

6  left the facility.

7          THE COURT:  All right.  So the informal nature

8  of e-mails, many circuits find, don't come in as business

9  records.  So I'm not going to let it in as a business

10 record.  And I think much like any prior statement, you

11 can question her on it.

12         So I'm going to sustain the objection.  You can

13 question her on it.  She can look at it, et cetera, but

14 I'm not going to move it in at this time.

15         MS. O'BOYLE:  Okay.  That's fine.

16 BY MS. O'BOYLE:

17 Q    And you were already -- but on April 11th --

18         MS. O'BOYLE:  We can take this down,

19 Ms. Roseberry.  Thank you.

20 BY MS. O'BOYLE:

21 Q    On April 11th, 2021, you'll agree with me you were

22 already gone from the facility, right?

23 A    Yes.

24 Q    And that was the first time that you had ever made

25 any allegations about Ms. Covington?

Shantae Moody-Moore - Cross                984

1  A    I made no allegations.  I was contacted by Mr. Norman

2  about the incident that occurred, because I was named from

3  a prior person as what took place that night.  So I only

4  responded to Mr. Norman about what took place.  That's

5  that e-mail right there.

6  Q    Okay.  And you know that your e-mail got

7  Ms. Covington walked out of the facility?

8  A    I was not aware of that.

9  Q    Okay.  Do you remember being interviewed by Special

10 Agent Anya Whitney in September of 2021?

11 A    I remember an interview with Ms. Whitney, yes, I do.

12 Q    Okay.  On transcript page 183, you told her, "My memo

13 got Lieutenant Covington walked out."

14 A    I do not recall saying that.

15 Q    Okay.  You have told members of this jury that

16 Mr. Walters was experiencing a medical emergency such that

17 Ms. Covington needed to send him to the hospital, right?

18 A    I didn't directly state that.

19 Q    So you don't think he needed to go to the hospital?

20 A    I feel that he needed to be assessed by a medical

21 team.

22 Q    Okay.  And he was assessed by a nurse at 8:15 in the

23 morning, right?

24 A    If that happened, I was not there.  I was off shift.

25 Q    Okay.  So you -- it's not your testimony that

 1  Ms. Covington needed to send Mr. Walters to the hospital?

 2  A    I did recommend that on my shift from 12 to 6.

 3  Q    Okay.  You never registered -- oh, from 12 to 6 in

 4  the afternoon?

 5  A    12 a.m. to 6 a.m.

 6  Q    Oh, okay.  I'm sorry.  But you never registered your

 7  alarm, right?  Never pressed your body alarm?

 8  A    Yes.

 9  Q    And you never pressed duces, right?

10  A    No.

11  Q    And you never radioed control to say that you had a

12  medical emergency on your floor?

13  A    No, because there was no immediate medical emergency.

14  I'm not a medical professional so therefore, that was the

15  point of Lieutenant Covington coming in as my supervisor

16  to assess the situation and make that determination.

17  There is no need to press a body alarm or administer OC

18  spray when there is no immediate threat.

19  Q    Right.  So there was no immediate threat.  And so you

20  actually told Special Agent Whitney back in September that

21  you did not press your body alarm because Mr. Walters was

22  just, you know, acting a little awkward?

23  A    And that is correct.

24  Q    Okay.  So can we at least agree that acting a little

25  awkward is not the equivalent of a serious medical

1  emergency?

2  A    It depends on the situation, the person and their

3  past medical history.

4  Q    Okay.  You never opened Mr. Walters' door that night,

5  right?

6  A    I did not.

7  Q    And you told Ms. Whitney that Mr. Walters did not

8  seem like he was a real damager to himself or anyone else?

9  A    By what I observed, he was not injuring himself

10 and/or his cellmate.  So I didn't see him as being an

11 actual threat to himself or his inmate.

12 Q    And you communicated that to Ms. Covington that day?

13 A    I'm sorry.  Can you repeat that?

14 Q    You communicated that Mr. Walters was not a threat to

15 himself or to his cellie --

16 A    I never spoke any of that to -- saying that he was

17 not a threat to anyone.  I said I did not know what he was

18 possibly capable of.

19 Q    Okay.

20 A    That's what I said.

21 Q    All right.  You said -- you told Ms. Whitney back in

22 September of 2021 that you thought he needed a stabilizer

23 for his mental health?

24 A    Not my words.

25 Q    Okay.  You told her back then, I think he needed to

1 see psychology or mental, somebody like that first and

2 then go from there?

3 A    What was told to me by Lieutenant Covington is, when

4 I recommended that he seek medical, is that he will have

5 to wait the next day to see psychology and medical.  So I

6 repeated that was told to me by my supervisor.

7 Q    Okay.  And when you first encountered Mr. Walters,

8 did you think that he was in immediate need of help?

9 A    I was not sure.  I'm not a medical professional.

10 Q    And, in fact, you continued the count, correct?

11 A    At that time, I -- the initial interaction, seeing

12 that he was just -- obviously, I didn't have time to

13 assess fully the situation, but I did have to do my job

14 and continue count.

15 Q    But you know that it's BOP policy that you can stop

16 the count for a medical emergency, right?

17 A    Correct, but count had not already started.  We were

18 about to start.

19 Q    Okay.  So you could have not done the count to

20 address the medical emergency that you were seeing with

21 respect to Mr. Walters, right?

22 A    Yes, and based off of Inmate Southerland saying that

23 he was okay and he didn't feel like he was in any harm, we

24 continued with count.

25 Q    Right.  So you don't think there was a medical

Shantae Moody-Moore - Cross                988

1    emergency at that time?

2    A    Because I had no time to assess at that moment.

3    Q    Well, but I think we just agreed that it's BOP policy

4    that if you're going to -- if you see a medical emergency,

5    you've got to stop the count, right?

6    A    Again, I did not know at that time if it was a

7    medical emergency.

8    Q    Okay.  And so if we could take -- I think you said

9    that you saw red Kool-Aid powder on the floor when you

10   first looked in?

11   A    When I first looked in, when I went back to actually

12   look in, after the count.

13   Q    Okay.

14   A    My initial stop and observation, yes, I did.

15   Q    Okay.  And are you sure that it wasn't actual red

16   liquid Kool-Aid that was on the floor?

17   A    With the red Kool-Aid stains mixed with urine, you

18   can basically say it was liquid because of urine mixed

19   with red Kool-Aid powder.  I mean --

20   Q    Well, or it could have just been red Kool-Aid spilled

21   on the floor, right?

22        You just saw liquid and it was red, correct?

23   A    No, that is incorrect.  I also saw open Kool-Aid

24   packets on the floor that further led me to believe that

25   it was the open red Kool-Aid that was on the floor mixed

1   with urine.

2   Q    Okay.  So I think your recollection was is that you

3   called her -- you first called Ms. Covington from the

4   office, the office on A-North, right?

5   A    If I recall correctly, I believe it was from the

6   actual A-North office.

7   Q    Okay.  And you're sure about that?

8   A    I -- if I recall correctly, I believe it was A-North

9   office that I called her from.

10  Q    And you think -- and that -- you had observed him for

11  what, five minutes, six minutes by that point?

12  A    I couldn't put an exact time on how -- between the

13  time I first went back to the cell and between my first

14  call with Ms. Covington.

15  Q    Okay.  But -- no.  How long had you -- you had

16  observed Mr. Walters for about five, six minutes by the

17  time you made the call to Ms. Covington?

18  A    Again, I cannot put an actual time on how long I

19  observed him.  I observed him enough to notice that

20  something was going on and I needed to contact my

21  supervisor.

22  Q    Well, you had a whole list of stuff, right, that you

23  said you told Ms. Covington?

24  A    From the initial observation, yes.

25  Q    Okay.  And so that wasn't -- that wasn't based on

Shantae Moody-Moore - Cross                           990

1   just an observation that was, like -- I don't know -- 45

2   or 50 seconds, right?  That was a long time.

3   A    You can assess and observe a lot of things in a

4   matter of seconds.

5   Q    Okay.  So you think it was seconds?

6   A    Like, again, I cannot put a time on how long I

7   observed Mr. Walters prior to contacting my lieutenant.

8   Q    Okay.  Well, but you -- let's go to Covington 30A,

9   which is a clip that's very similar to the government's

10  clip that they just moved in, just a little longer.

11            THE COURT:  All right.

12            MS. O'BOYLE:  And I'm going to -- to move this

13  in, I'm going to play a little bit of it --

14            THE COURT:  Please.

15            MS. O'BOYLE:  -- for the witness and then --

16            THE COURT:  Unless there's no objection.

17            MS. GILBERT:  No objection, Your Honor.

18            MS. O'BOYLE:  Oh, okay, great.  Thank you.

19            (Defendant Covington Exhibit Number 30A was

20            admitted.)

21  BY MS. O'BOYLE:

22  Q    So I'm going to start -- this is the same time frame

23  that you -- that the government just showed you just a

24  little bit longer.

25            THE COURT:  Hold on, Ms. O'Boyle.  Did we have

Shantae Moody-Moore – Cross                    991

1    an exhibit number for that one?

2               MS. O'BOYLE:  I'm sorry.  This is 30A.

3               THE COURT:  Okay.  30A, Ms. Jones.

4               THE CLERK:  Thank you.

5               MS. O'BOYLE:  Sorry.  Pause.  And may we

6    publish, Your Honor?

7               THE COURT:  You may.

8               MS. O'BOYLE:  Thank you.

9               So just for the record, we're starting this clip

10   at January 9, 2021, at 3:41:47 a.m.

11              (Video Played.)

12              MS. O'BOYLE:  Okay.  I'm going to pause it at

13   3:42:16 a.m.

14   BY MS. O'BOYLE:

15   Q    And is that you walking away from the door?

16   A    Yes.

17   Q    Okay.  So you monitored Mr. Walters, would you agree

18   with me, from 3:41:47 a.m. to 3:42:16 a.m.?

19   A    That is incorrect.  I didn't monitor Mr. Walters.  I

20   was having a conversation with Mr. Southerland.

21   Q    Okay.  Thank you for the correction.

22              So you talked to Mr. Southerland for about 30 --

23   my math isn't good -- about 32 seconds?

24   A    It was a brief conversation about his concerns about

25   his cellmate, and I proceeded to let him know that I had

1   to conduct count and I walked off.

2   Q    Okay.  So no sense of urgency here, right?

3   A    At that moment, I was about to conduct count.

4   Mr. Southerland stated that he was okay and he didn't

5   think that his cellmate was going to threaten him or

6   anything.  So I proceeded with my count.

7   Q    So you can agree with me there was no sense of

8   urgency, correct?

9   A    At that moment, I didn't believe that there was any

10  sense of urgency from what I observed just by talking to

11  Mr. Southerland.

12  Q    All right.  And we're going play a few more seconds

13  here.  Starting at 3:42:16.

14              (Video Played.

15  BY MS. O'BOYLE:

16  Q    Is that you going back to -- and who was with you?

17  A    Officer Barnes.

18  Q    Okay.  All right.  That's you and Ms. Barnes

19  continuing to conduct the count, correct?

20  A    Correct.

21  Q    All right.  I'm going to pause it here at

22  3:42:41 a.m., and I'm going to fast-forward.  Because you

23  continue -- you do count, right?  You go through and you

24  check all the cells?

25  A    Correct.

Shantae Moody-Moore - Cross                    993

1   Q    Okay.  All right.  I'm going to start this again at

2   3:43:51 a.m. on January 9th.

3              (Video Played.)

4   BY MS. O'BOYLE:

5   Q    And is that you coming around the other side?

6   A    Yes.

7   Q    Okay.  So you're doing count on that side?

8   A    Correct.

9   Q    All right.  I'm going to pause at 3:44:17 a.m.  Is

10  that you going back to Mr. Southerland and Mr. Walters'

11  cell and peeking in?

12  A    Yes, that's myself.

13  Q    And so is this the second time that you talked with

14  him?

15  A    I honestly cannot recall why I walked right back to

16  that cell right after count.

17  Q    Okay.  So we're going to continue -- we'll see how --

18  3:44:17.

19              (Video Played.)

20  BY MS. O'BOYLE:

21  Q    Okay.  And we're going to pause at 3:44:30 a.m. on

22  January 9, 2021.  So that -- you paused at -- I guess it

23  was 3:40 something 17.  So you talked to Mr. Southerland

24  for another 15, or so, seconds?

25  A    That's what it appears to be.

Shantae Moody-Moore – Cross                    994

1  Q     Okay.  And then continuing from 3:44:31.

2            (Video Played.)

3  BY MS. O'BOYLE:

4  Q     Where are you going now?

5  A     I should be going where that green desk is to use the

6  telephone to -- oh, I'm sorry.  We haven't finished count.

7  We only did the downstairs.

8  Q     Okay.

9  A     So if we're going upstairs, we're conducting count

10 upstairs.

11 Q     Okay.  So you go and you conduct count upstairs; is

12 that right?

13 A     Yes.

14 Q     Okay.  I'm going pause here at 3:44:55 a.m., and I'm

15 going to fast-forward -- because you have to do the round

16 all the way up on the top too, right?

17 A     Correct.

18 Q     Okay.  I'm going to fast-forward.

19            MS. O'BOYLE:  I'm sorry, Your Honor.  For the

20 record, I'm going to start it back up January 9, 2021, for

21 3:47:17 a.m.

22 BY MS. O'BOYLE:

23 Q     And is that you walking back over to the middle

24 console?

25 A     Yes.

Shantae Moody-Moore - Cross                    995

1    Q    And what are you doing here?

2    A    At this time, I should be picking up the phone to

3    call control to report my count for A-North.

4    Accountability.

5    Q    And I'm stopping at 3:47:27.  And you did pick up the

6    phone to call control, right?

7    A    Correct.

8    Q    And so you didn't make another call from this console

9    that day?

10   A    Not that I recall.

11   Q    All right.  So we're starting back up at 3:47:28.

12            (Video Played.)

13   BY MS. O'BOYLE:

14   Q    All right.  And you just set the phone down at

15   3:47:42.  Do you see that?

16   A    Yes.

17   Q    So that was you calling in count?

18   A    Yes.

19   Q    Okay.  All right.  And starting back up at 3:47:42.

20            (Video Played.)

21   BY MS. O'BOYLE:

22   Q    Did you see -- stopping at 3:47:51.  You went back

23   and picked up the phone again, correct?

24   A    Yes.  And I'm not exactly sure.  I know with that

25   side, on numerous occasions prior to this, that sometimes

Shantae Moody-Moore - Cross                996

1   the phone inside the unit has a lag and/or has -- it

2   doesn't work here and there.  So sometimes we would have

3   to -- so it could have been that there, but I'm not too

4   sure.  I can't recall.

5   Q    Or it could have been you calling Ms. Covington,

6   right?

7   A    From the middle, like I said, I cannot recall if I

8   made my first phone call to Lieutenant Covington from

9   there and/or the office, but the phone call was made.

10  Q    Okay.  So it's possible you actually made it -- that

11  this is actually the call.  When you're picking up the

12  phone again, you're calling Ms. Covington at 3:47:51 a.m.?

13  A    I cannot guarantee that that phone call was to

14  Lieutenant Covington.  I'm not going to say that phone

15  call was to Lieutenant Covington.

16  Q    Okay.  But can we at least agree that you don't

17  recall sitting here today whether that phone call took

18  place from that center console or in the A-North office?

19  A    I am saying that I could have maybe possibly called

20  Lieutenant Covington from that center console, but at that

21  time I am not agreeing or saying that that phone call,

22  that's early on, because that's not the phone call that

23  was made that early on to Lieutenant Covington because I

24  had no time to observe Mr. Walters or Mr. Southerland at

25  that time to report anything to Lieutenant Covington.

1  Q    Okay.  So you -- so you're telling the jury that that

2  second phone call, you don't remember who it was to, but

3  you're certain it wasn't to Ms. Covington?

4  A    At this time, that phone call, I do not believe that

5  phone call was made to Lieutenant Covington because I had

6  no real time to observe Mr. Walters and Mr. Southerland at

7  that time to report anything.

8  Q    Now, you certainly documented this serious medical

9  emergency in the Bureau of Prisons records, right?

10  A    I'm sorry?

11  Q    You documented this serious situation with

12  Mr. Walters in prison records, correct?

13  A    What do you mean about documented?

14  Q    Well, you have an obligation as an officer to

15  document in TRUSCOPE, correct?

16  A    Yes.  We -- we -- we can write notes into the system,

17  if I recall.  It's been so long with the TRUSCOPE.  I'm

18  not sure if that's even what it's called.  But we did have

19  spots where we can write little notes if need be about --

20  Q    Well --

21  A    -- conducting our rounds.

22  Q    I'm sorry.  I didn't mean to interrupt you.

23         It's not optional.  It's actually what you're

24  supposed to do as part of your job?

25  A    Yes, as far as conducting our rounds.  As far as

Shantae Moody-Moore - Cross                998

1   anything medical, I believe you could put something in

2   there if it was an emergency.  But what is the need of

3   putting something like that in TRUSCOPE, typing it out

4   what I have my set -- my telephone to contact immediately

5   Lieutenant Covington?

6   Q    All right.  Well, you know that you have to review

7   post orders, correct?

8   A    Yes.

9   Q    And post orders actually tell you what you need to do

10  for your job, right?

11  A    Yes.

12  Q    And you know that the post orders actually direct you

13  to make note of any unusual activity while you're on the

14  unit, right?

15  A    I believe so.

16  Q    So you're supposed to use TRUSCOPE to document what's

17  going on, right?

18  A    I believe so.

19  Q    Okay.  And so if we could take a look at Covington

20  Exhibit 16.

21          MS. O'BOYLE:  Just for the witness, please.

22  BY MS. O'BOYLE:

23  Q    This is your TRUSCOPE record from January 9th, 2021,

24  to January 10th, 2021, correct?

25  A    I believe so.

Shantae Moody-Moore - Cross                999

1  Q    Okay.  Your number was -- the user number, you were

2  68820?

3  A    I cannot remember from three years ago.  Sorry.

4  Q    That's okay.

5         MS. O'BOYLE:  And so this -- so this was a

6  business record that the government agreed to admit.  So

7  we're going to ahead and admit Exhibit 16.

8         MS. GILBERT:  No objection, Your Honor.

9         THE COURT:  All right.  It will be admitted.

10        (Defendant Covington Exhibit Number 16 was

11        admitted.)

12 BY MS. O'BOYLE:

13 Q    And so you did not document anything in TRUSCOPE

14 about Mr. Walters, right?

15 A    It doesn't appear that I did.

16 Q    Okay.  So you can agree with me that this wasn't

17 exactly policy, you weren't following policy by not

18 documenting anything?

19 A    I cannot say for certain that I was not following

20 policy because I did my notifications.  I may have not put

21 it in TRUSCOPE, but I did notify my immediate supervisor,

22 which I'm pretty sure is part of that BOP policy.

23 Q    Okay.  And you usually -- but you do actually -- you

24 have used TRUSCOPE to enter unusual activity on the unit,

25 right?

Shantae Moody-Moore – Cross                    1000

1  A    At one point I may have.  Like I said, I cannot

2  recall everything that took place.

3  Q    Okay.

4         MS. O'BOYLE:  If we could have Covington 29,

5  page 113, please.

6         At this time, Your Honor, I'm just going to seek

7  to admit this one page.

8         We -- Ms. Covington moves to admit 29, page 113.

9         THE COURT:  What is it?

10        MS. O'BOYLE:  I'm sorry.  It's the TRUSCOPE

11 report for Ms. Moody-Moore dated January 6, 2021,

12 related --

13        THE COURT:  All right.

14        MS. GILBERT:  No objection, Your Honor.

15        THE COURT:  It will be admitted.

16        MS. O'BOYLE:  Thank you.

17        (Defendant Covington Exhibit Number 29 was

18        admitted.)

19 BY MS. O'BOYLE:

20 Q    All right, Ms. Moody-Moore.  On January 6, 2021, you

21 used TRUSCOPE to document "pidgeon has been in the unit

22 since the beginning of my shift with bird droppings

23 throughout the unit.  Lieutenant was notified and informed

24 me she will get safety in here on the next shift."  Do you

25 see that?

Shantae Moody-Moore - Cross                    1001

1   A    Yes.

2   Q    So it was important enough three days before

3   Mr. Walters to document pidgeon droppings, correct?

4   A    By this, it appears.  I don't see how that connects.

5   I don't see how this connects to the incident at hand.

6   Q    Okay.  Well, you documented pidgeon droppings in

7   TRUSCOPE?

8   A    And I also notified my lieutenant of a possible

9   medical emergency as well.  Whether it was documented on

10  here and/or verbal, it was documented.  It was noted by

11  lieutenant and received by Lieutenant Covington.

12  Q    Okay.  But you didn't think it was sufficiently

13  important to document anything related to Mr. Walters in

14  TRUSCOPE that night?

15  A    That is incorrect.  It was important enough for me to

16  report what was going on with Mr. Walters, which I did in

17  immediate fashion.  Versus going this route, I contacted

18  my lieutenant immediately when I observed the situation.

19  Q    Okay.  You told the jury -- or actually, I think

20  Mr. Everhart showed you your contemporaneous notes, those

21  pink notebook pages?

22  A    Correct.

23  Q    Okay.  And you said you were taking those notes at

24  the exact same time that things were going on, or right

25  after -- during your shift?

Shantae Moody-Moore - Cross                    1002

1    A    It was during -- it was during my shift, not at the

2    exact time.  As I was trying to state, I documented, wrote

3    down things that I could throughout my shift, starting as

4    much as I could at the beginning of that situation.

5    That's why on or about this such -- this time.

6    Eventually, I did end up stopping, writing notes because

7    the situation at hand did seem to escalate a little bit so

8    more or less, just contacting Lieutenant Covington

9    throughout the rest of the shift about it.

10   Q    Okay.  You got a subpoena that compelled you to

11   produce that pink notebook, right, the full pink notebook,

12   right?

13   A    Correct.

14   Q    But you did not produce the notebook, did you?

15   A    Because of during a move, I had got rid of it.  I

16   didn't even know that it was needed during a move.  So --

17   Q    And you moved in April of 2021?

18   A    No.  We had a storage unit that we had with our items

19   in it that we discarded of.  So it wasn't because we had

20   just moved when I started working with BOP.  But we had a

21   storage that we had our belongings in of items that we

22   were getting rid of.

23   Q    Okay.

24   A    So when I got ready to accept the job up in D.C.,

25   that item was discarded of.

Shantae Moody-Moore - Cross                          1003

1  Q    Okay.  So -- when you accepted the job in D.C.  So it

2  was April of 2021?

3  A    I actually received a final offer prior to April,

4  hence the reason why I was immediately picked up and just

5  transferred out of BOP, straight to the other job.

6  Q    Okay.  So it was -- I mean, is it April 2021, because

7  these -- or May --

8  A    The left BOP in March of --

9  Q    March?

10         THE COURT:  Hold on.  Hold on.  Hold on.

11         MS. O'BOYLE:  Sorry.

12         THE COURT:  So both of you can't talk at the

13  same time.

14         THE WITNESS:  Oh, sorry.

15         THE COURT:  That's okay.  Because she can't type

16  both of you all at the same time.

17         THE WITNESS:  Oh.

18         THE COURT:  So let her finish her question and

19  then you answer and vice versa.

20         MS. O'BOYLE:  Thank you, Your Honor.

21         THE COURT:  Go ahead and ask your next question.

22  BY MS. O'BOYLE:

23  Q    So you think you got rid of the notebook in March of

24  2021?

25  A    I'm not exactly sure when the notebook was discarded

Shantae Moody-Moore - Cross                    1004

1  of.  It was amongst belongings that were eventually stored

2  in my unit prior to my relocation to the D.C. area for my

3  new job.

4  Q    So you lost the notebook somewhere between -- or

5  discarded it, I'm sorry, in March of 2021 before you

6  moved.  So how were you able to give those pages to

7  Ms. Whitney in September of 2021?

8  A    The reason being, in that pink notebook, that pink

9  notebook that I had did not only contain stuff that -- it

10 wasn't for only just work purposes.  I had my own personal

11 notes that I wrote, just daily living-type things in

12 there.  Some pages I did tear out of my notebook and put

13 in the house.  It's -- I can't really too much explain,

14 but it was not -- that notebook was not for work purposes.

15 It had other stuff that pertained to my daily life in my

16 notebook.

17 Q    Okay.  But how did you give the pages to Ms. Whitney

18 if you got rid of a notebook or lost it in March of 2021?

19 How did you give it to her in September?

20 A    If you see the ridges on the page and you can see

21 that it was torn out of a notebook, like many other pages

22 of my stuff that I wrote down prior to personal life.  So

23 it was in that mix of pages that I had torn out, and it

24 was in there as well.

25 Q    Okay.

Shantae Moody-Moore - Cross                    1005

1  A    Like I said, it got discarded of.

2  Q    And these were notes that you took --

3            MS. O'BOYLE:  If we could have Exhibit 87.

4            MS. ROSEBERRY:  What exhibit?

5            MS. O'BOYLE:  Exhibit 87.

6  BY MS. O'BOYLE:

7  Q    These were -- you said these were notes that you took

8  at the same time of the event?

9  A    It was throughout -- not at the exact approximate

10 time of it happening.  So as I observed, what I observed,

11 I may have went back, had wrote some things down

12 throughout the shift.  It was throughout -- what I could,

13 throughout the shift until I eventually stopped writing

14 and just had to just react for my job.

15 Q    Okay.

16           MS. O'BOYLE:  Covington moves in Exhibit 87.

17           MS. GILBERT:  Your Honor, same objection as

18 before.  I'm just confused about how this would come in.

19 This is the witness' prior recollection.

20           MS. O'BOYLE:  And under the hearsay rules, this

21 is a contemporaneous statement.  It's an exception to the

22 hearsay rule.

23           MS. GILBERT:  The exception would be prior

24 inconsistent statements.  So I think if she denies it -- I

25 don't know what other exception --

Shantae Moody-Moore - Cross                    1006

1          MS. O'BOYLE:  No.  It's a -- I'm not trying to

2  get it in as a prior inconsistent statement.  I'm trying

3  to get it in as a document that was made contemporaneous

4  with the events, which, under the hearsay rule, is

5  permissible.

6          THE COURT:  One moment.

7          Where, under 803, do you find prior

8  contemporaneous statement?  I see prior statements by a

9  witness.  I see prior inconsistent statement.  I see prior

10  consistent statement.  I'm looking under 803.  I don't see

11  prior contemporaneous statements.

12          MS. O'BOYLE:  Your Honor, I'll move on.  I think

13  it's under the other -- it's under the other hearsay

14  exception.

15          THE COURT:  Then just move on.

16          MS. O'BOYLE:  I will move on, yes.

17  BY MS. O'BOYLE:

18  Q    I want to talk about the last call that you described

19  for the jury, the one where Ms. Covington attempted to

20  mandate you.  Do you remember that?

21  A    I remember the phone call where she attempted to

22  mandate.  I believe it was closer toward the end of my

23  actual shift when I got that phone call.

24  Q    Ms. Covington called you?

25  A    Yes.

1  Q    Okay.  And any witnesses to this call or was it just

2  the two of you?

3  A    No, I don't believe there was any witnesses.  I

4  believe I was in the unit by myself, on the phone with

5  Lieutenant Covington.

6  Q    And Ms. Covington told you that you were being

7  mandated, right?

8  A    Correct.

9  Q    And you told your supervisor, "I will be leaving at

10 8:00 because I'm already on the 16-hour shift," correct?

11 A    That sounds about right, correct.

12 Q    So you were happy because you got to tell her that

13 she wasn't going to mandate you?

14 A    Yes, there was some satisfaction to that.

15 Q    You frustrated her plans to mandate you, right?

16 A    I'm sorry?

17 Q    You frustrated her plan to mandate you?

18 A    I frustrated her plans to mandate?

19 Q    Yeah.  She wanted to mandate you, and you stood up to

20 her and told her no?

21 A    I just informed her that I was on 16 hours.  Per BOP,

22 if you're on a 16, you cannot possibly work a whole other

23 shift.  So I was already on a 16.  That's BOP policy.

24 Q    So your testimony is that after you stood up to

25 Ms. Covington, she asked you to lie for her?

1  A    I'm sorry.  Repeat that.

2  Q    After you told Ms. Covington that she wasn't going to

3  mandate you, she asked you for a favor?

4  A    In reference to putting her in the system for a

5  round.

6  Q    In fact, Ms. Moody-Moore, you're not even definite at

7  all that Ms. Covington called you that night at any point?

8  A    I do recall her calling me that -- throughout that

9  shift, again, when she called me to mandate me and asked

10 me to put me -- her in for a round.  She did contact me.

11 Q    You met with prosecutors in this case on November 20,

12 2024, right?  Just last month.

13 A    I believe that's the correct date, yes.

14 Q    And you remember you reviewed your grand jury

15 testimony at that time?

16 A    Yes.

17 Q    And that testimony was made under oath, just like it

18 was today, right?

19 A    Correct.

20 Q    And you cannot lie or mislead the grand jury?

21 A    Correct.

22 Q    But you wrote corrections to your grand jury

23 testimony that day?

24 A    Yes, I did.

25 Q    Okay.  And you wrote a correction to your grand jury

Shantae Moody-Moore - Cross                    1009

1    testimony --

2              MS. O'BOYLE:  If we could take a look at

3    Covington Exhibit 151, page 2.

4    BY MS. O'BOYLE:

5    Q    You actually wrote a correction to your grand jury

6    testimony?

7    A    That is correct.

8    Q    And it says, "Did Covington ever call you back that

9    night to talk about Mr. Walters?"

10             And you replied, "After trying to recall that

11   incident/night, I am not definite in my answer if

12   Covington called me at any point that night.  I know for

13   certainty that I called her."

14             Do you see that?

15   A    And, again, my statement in regards to did she call

16   me about Mr. Walters and her calling me about a mandate

17   and/or me informing her that I was on the 16 is two

18   different things.

19   Q    So three weeks ago you were not definite that

20   Ms. Covington called you at any point that night?

21   A    About the incident surrounding Mr. Walters.  She did,

22   in fact, call me that night about mandating me and putting

23   me(sic) in for a round.  Again, two separate things.

24   Q    Okay.  You told the jury -- you had the discussion

25   about the fall.  Do you remember that?

1  A    Yes.

2  Q    And you said that Mr. Walters walked back towards the

3  bed, right?

4  A    Yeah.  He walked from the front of the cell door

5  toward the back where the window is, toilet and then trash

6  can was there.

7  Q    Okay.  And you said that he -- you wanted him to sit

8  on the bed?

9  A    Correct.

10 Q    And he -- he, instead, tried to sit on the trash can?

11 A    Yes.

12 Q    And he's back in the back of the cell at the time?

13 A    Yes, walking toward the back, and the trash can

14 wasn't at the back of the cell.  It was prior -- in

15 between the window and the cell door.  So it was in

16 between.

17 Q    Okay.  And so he's walking towards and he fell and

18 hit his head?

19 A    No, he wasn't walking toward and fell.  He walked.

20 He sat down on the trash can.  As he sat down on the trash

21 can, he stumbled over, bumped his head on the toilet.

22 Q    So you're good friends with an employee named Barbara

23 White, right?

24 A    Yes.

25 Q    You told Ms. White that you did not see Mr. Walters

Shantae Moody-Moore - Cross                    1011

1    hit his head on the toilet?

2    A    I never had that conversation with Ms. White.

3    Q    You told your friend Ms. White that the cellmate told

4    you that he fell and hit his head on the toilet?

5    A    I never had any such conversation with Ms. White.

6    Q    Okay.  Now, you talked a little bit about the razor.

7    Do you remember that?

8    A    Yes.

9    Q    And you got the razor from Ms. Pryor?

10   A    No.  What took place was while Ms. Pryor, Officer

11   Pryor was standing watch at the door, I was -- as I'm

12   walking back, I overheard her say, "Push that under the

13   door."

14        She relayed back to me what was taking place.  I

15   did not actually observe.  I only written down what was

16   relayed to me as I wasn't at the cell at that time when

17   that actually happened.

18   Q    Okay.  Now, when you -- moving on.  When you

19   explained -- or you don't remember complaining to the

20   associate warden, do you?

21   A    No, I don't recall that.

22   Q    You don't remember telling him that Ms. Covington was

23   telling people your personal business, your personal

24   health business?

25        MS. GILBERT:  Objection, Your Honor.  I believe

Shantae Moody-Moore - Cross                1012

1  this has been asked and answered.  The witness said she

2  doesn't remember complaining to Associate Warden Wilson?

3          THE COURT:  Ms. O'Boyle.

4          MS. O'BOYLE:  I'll move on.

5          THE COURT:  Thank you.

6  BY MS. O'BOYLE:

7  Q    On the 9th after you left Petersburg, you -- the

8  first time at 8:00 a.m., right?

9  A    Oh, yes.  That morning, yes.

10 Q    And then you -- because you were coming back and

11 working a little bit later, right?

12 A    Yes.

13 Q    In between there, you got a doctor's note stating

14 that you could only work eight hours a day from Patient

15 First?

16 A    If I recall correctly, my Patient First -- my medical

17 situation occurred prior to that incident that night.  If

18 I recall correctly, my Patient -- my medical incident

19 happened in December, and I was on light duty and returned

20 back on shift around or close to this time of the

21 incident, hence why I was in the unit working.

22         So I can't definitely say that I received a

23 Patient First during this time.  Because if that's the

24 case, I was on -- literally on light duty.  If I was on

25 light duty, I would not have been in the unit to even

Shantae Moody-Moore - Cross                    1013

1  witness this.

2  Q    That's right.  Well, let's take a look at Covington

3  Exhibit 82.  And this is an e-mail that you wrote,

4  Ms. Moody-Moore, on January 13, 2021.  Do you see that?

5  A    And it appears that was on January 13th, after

6  January 9th.

7  Q    Correct.  And if we go down to the third page, you

8  see a doctor's note dated January 9th, 2021?

9  A    Yes.

10  Q    Okay.  And does that refresh your recollection that

11  you went to Patient First and got a doctor's note on

12  January 9, 2021, that had the restrictions of not working

13  beyond eight hours a day?

14  A    Okay.  So then, indeed, it was.  I know I did have a

15  light duty work, so yes.

16  Q    Okay.  And you got in on January 9th in between your

17  shifts, right?

18  A    It couldn't have been in between my shift.  I didn't

19  get off shift until 8:00.  So it would've had to have

20  occurred after my shift.

21  Q    Well, you got this note on January 9, 2021, correct?

22  A    That's what it appears --

23  Q    Right.

24  A    -- correct.

25  Q    And after you got this note, this light duty note

1  saying that you can't work beyond eight hours a day, you

2  went back to Petersburg, right?

3  A    Can you rephrase the -- what are you -- I'm not

4  following.  What you mean by I went back to Petersburg?

5  Q    Well, you had a shift at Petersburg.  You worked with

6  Lieutenant Boxley that same day, on January 9th, from 4 to

7  midnight -- or 6.  I'm sorry.  6 to midnight, right?

8  A    No.  The shift would have been 4 to midnight.  I went

9  in --

10 Q    I'm sorry.  Yes.

11 A    -- for overtime.  It would have been 4 to midnight.

12 Q    Okay.  From 4 to midnight.  But you remember you came

13 back later that day to work, right?

14 A    If I recall correctly, yes.

15 Q    Because you actually went back and saw -- I believe

16 you testified on direct you went back and saw -- you went

17 and saw Mr. Walters?

18 A    Yes.  I seen Mr. Walters the next day when I went

19 back in.

20 Q    But you had already worked an eight-hour shift that

21 day.  You worked the morning watch shift, right?

22 A    I worked morning and I went in at 4 to make it a

23 16-hour shift for me for the -- for my shift.

24 Q    Okay.  And when you got to work, you didn't present

25 this doctor's note to Lieutenant Boxley, did you?

Shantae Moody-Moore - Cross                    1015

1  A    Not to Lieutenant Boxley.  From what I was told, we

2  have to give it to our immediate supervisor, which would

3  have had to be Lieutenant Covington.

4  Q    You did not give the doctor's note to Lieutenant

5  Boxley that day, did you?

6  A    Not that I recall.  I recall giving it to Lieutenant

7  Covington because, like I said, we were supposed to report

8  stuff like this to our shift supervisor, and Mr. Boxley

9  was not and it was Lieutenant Covington.  So I do not

10 recall if I gave a copy to Lieutenant Boxley as well, but

11 I know I did to Lieutenant Covington.

12 Q    Okay.  And, in fact, Lieutenant Boxley mandated you

13 that day, right?

14 A    No.  I came into work for an extra shift from 4 to 12

15 and to work my 12 to 8.  He couldn't have possibly

16 mandated me if I was coming in for overtime.

17 Q    I'm sorry.  That was an inartful question.  After you

18 worked that 4 to 12 shift, you actually worked the 12 to 8

19 shift again on January 10th?

20 A    Correct.  Sixteen hours, correct.

21 Q    So you worked -- after getting this doctor's note

22 that said that you could have light duty, you worked

23 another 16 hours?

24 A    Yes.  Because, again, when I received this note,

25 Lieutenant Covington at that time, seeing that we just

Shantae Moody-Moore - Cross                          1016

1  came off of morning watch and got off at 8:00, she would

2  not be back in, technically, until the 12:00 shift.  I was

3  already there from 4 to this -- 4 to 12, hence I had to

4  give my note to Lieutenant Covington as I was directed.

5  Q    Directed by who?

6  A    Well, I was told to give it -- well, from what I

7  remember, like I said, any excuses, any work notes, we

8  have to give it to our shift supervisor, and my shift

9  supervisor was Lieutenant Covington.

10 Q    Well, when you go in at -- from 4 to 12, your shift

11 supervisor was Lieutenant Boxley, correct?

12 A    I don't remember.  I thought -- it could have been

13 Lieutenant Aikens or Box- -- I don't know which lieutenant

14 it was that day.  It's been a while.

15        THE COURT:  I think we've exhausted this line of

16 questioning.

17        MS. O'BOYLE:  All right.  We're good,

18 Your Honor.  We'll move on.

19 BY MS. O'BOYLE:

20 Q    Because, actually, the first time you presented this

21 light duty note was on January 13th, 2021, to

22 Ms. Covington?

23 A    I don't know that to be true.  No.

24        This right here, if I'm not -- I believe this is

25 what I showed Lieutenant Covington when I came on -- when

Shantae Moody-Moore - Cross                    1017

1   she came onto shift when I was already on my -- starting

2   my 16 is when I showed her.  Me sending that e-mail, if we

3   can go back to the e-mail, please.

4   Q    Sure.  Whoops.  Sorry.

5   A    So as we see here, this is just explaining -- I don't

6   see how me writing this on the 13th is really connecting.

7   I showed the note from Patient First, the little piece of

8   paper, to Lieutenant Covington prior to writing this.

9            It was a response that I got back, seeing what

10  that doctor's note because I was in and out of pain with

11  certain things that was going on and I was refused.

12  Hence, that's why this note was written.  So --

13  Q    Right.  And the first time that you ever presented

14  the note was to Ms. Covington on January 13th?

15  A    No.  It had to be on the -- when I seen her when I

16  came in for my next shift, when I worked the 4 to 12 and

17  the 12 to 8.  It would have had to be that day.

18  Q    January 9th into January 10th?

19  A    January 9th, I was -- what time did we get off on

20  January 9th?  I'm trying to think.

21  Q    Well, you got off on January 9th at 8 a.m., right?

22  A    8 a.m.  And if I recall correctly, the Patient First

23  note was at 16, 16:54, which would have been in the

24  afternoon time frame.

25  Q    Right.

Shantae Moody-Moore - Cross                    1018

1  A    Mind you, with that being said, if I came in for

2  overtime and worked another shift and Lieutenant Covington

3  wasn't coming in until 12 and I'm working a 16, that's

4  when that probably would have been presented, if I'm

5  following everything correctly of where you're directing

6  this towards.

7  Q    Okay.  When Special Agent -- this is my last set of

8  questions.

9        When Special Agent Whitney interviewed you, you

10 told her that you were telling my truth; isn't that right?

11 A    I'm sorry.  Repeat that for me.

12 Q    When Special Agent Whitney interviewed you back in

13 September of 2021, you told her that you were telling my

14 truth; isn't that right?

15 A    I don't recall saying my truth.  I may have said -- I

16 may have worded it different, saying that I would be

17 telling what I believe and what I recall happened from

18 that incident that night.  All I can do is recall from my

19 standpoint of what I remember.  So --

20 Q    Okay.  At transcript page 182, lines 11 through 13,

21 you said, "I don't know what to say.  I'm telling my truth

22 of what happened."

23 A    Okay.  So my truth of what I experienced of what

24 happened that night.  I can only tell what I experienced,

25 what I remember to the best of my ability.  So my truth.

Shantae Moody-Moore - Redirect                1019

1  Q     You did not tell Special Agent Whitney that you were

2  telling the truth, right?

3  A     It's my truth of me being in that position at that

4  time.  So it is my truth, because I was involved at one

5  point in that time in that incident.  So it is considered

6  my truth as well.  But the truth.

7          MS. O'BOYLE:  All right.  I have no further

8  questions for this witness.  Thank you, Your Honor.

9          THE COURT:  All right.  Thank you very much.

10         All right, government.  Any redirect?

11         MS. GILBERT:  Yes.  Thank you, Your Honor.

12                   **REDIRECT EXAMINATION**

13  BY MS. GILBERT:

14  Q     Hello again, Ms. Moody-Moore.  I just have a few

15  follow-up questions just to clear up a few things.

16  A     Okay.

17  Q     Defense counsel just showed you a doctor's note,

18  which the jury didn't have a chance to see but is dated

19  January 9th, 2021, you testified?

20  A     Okay.

21  Q     Who put that date on the doctor's note, if you know?

22  A     Can I look -- are we referring to the printed date

23  that was up --

24  Q     Yeah.  Well, let me ask you, did you write that

25  doctor's note?

1  A    No, I did not.

2  Q    So someone dated that note, but do you know exactly

3  when you received that note?

4  A    I can't really recall.  I'm just going by what I'm

5  seeing on the screen, because I really cannot recall.  I

6  did know that I did, around the December/January time

7  frame, have some on and off medical situations going on,

8  but I can't really recall when I actually received it,

9  who -- but I do know that I did eventually, at one point

10 in time, go to Patient First.

11 Q    Okay.  And I'm not going to ask you about your

12 personal health issues at all.  Either way, you worked --

13 just to clarify, you worked from 12 to 8, the morning

14 watch shift, on January 9th?

15 A    Correct.

16 Q    And then you came back on at 4:00?

17 A    Correct.

18 Q    At which point you worked 16 hours?

19 A    Correct.

20 Q    Okay.  And you were already scheduled for that shift?

21 A    For?

22 Q    Actually, both shifts.  You were previously scheduled

23 for those before that day?

24 A    Previously scheduled, yes, ma'am.

25 Q    Okay.  Defense counsel asked you some questions about

Shantae Moody-Moore – Redirect                    1021

1  whether you completed your own round records that night,

2  and you did not, correct?

3  A    No.

4  Q    What was your priority that night?

5  A    My priority that night was once I observed the

6  situation with Mr. Walters, that was my top priority, to

7  do whatever I could to assist and assess what I could that

8  night.  Hence, the reason why I was technically supposed

9  to be stationery on A-South side office.  Instead, I took

10 it upon myself to go to A-North side with my belongings

11 just so I can keep watch on Mr. Walters and

12 Mr. Southerland.  So that was my priority that night.

13         Still, I did have my -- the rest of my job to

14 do, which I did, of course do, and I just gave some small

15 instructions to Mr. Southerland just in case I was needed

16 in between me doing my other rounds throughout --

17 throughout the other unit.

18 Q    Okay.  And when you did not complete your rounds

19 records, did you ask anyone else to falsely enter rounds

20 records for you?

21 A    No.

22 Q    You were asked about your opinion on whether

23 Mr. Walters needed to go to the hospital, and I think you

24 testified, and correct me if this is wrong, that you

25 thought that he did, but whose job was it to look at

1  Mr. Walters and decide if it was a medical emergency?

2  A    The final decision would have came down to my

3  supervisor, my operations lieutenant.

4  Q    We watched some video of you conducting count, and I

5  just wanted to clarify.  I believe you said on direct that

6  when you were -- you started out with count,

7  Mr. Southerland stopped you to talk to you?  That was a

8  brief conversation?

9  A    Correct.

10  Q    When did you go back to get additional information

11  from Mr. Southerland, with the understanding you don't

12  know exact times?

13  A    So it was after our first count, after -- it was

14  after -- I know it was after the phone call I made to call

15  in count.  I can't recall right in between what spot.  I

16  know it was probably roughly -- I can't recall.  But I did

17  go back to his cell where that first initial longer

18  observation happened where I was able to be able to

19  observe enough to go back to the office and call

20  Lieutenant Covington.

21  Q    Okay.  And we don't have time now to watch all the

22  video, but you did go back to the cell several times

23  during your shift; is that right?

24  A    Yes.

25  Q    Okay.  I did want to play one clip of video.

Shantae Moody-Moore - Redirect                    1023

 1         MS. GILBERT:  If I could ask Ms. Brandon to

 2   please pull up 17D.  And to be clear this is a part of

 3   Exhibit 17, which has previously been admitted.  This is a

 4   clip of that video, starting at 4:24:27 on January 9th.

 5              (Video Played.)

 6         MS. GILBERT:  If we could pause there.  We're at

 7   4:25:03.

 8         MS. O'BOYLE:  Sorry, Your Honor.  That was my

 9   timer.  I apologize.

10         MS. GILBERT:  It's okay.

11         THE COURT:  All right.

12   BY MS. GILBERT:

13   Q    Who was seen running on the video there?

14   A    That was me.

15   Q    Is there a phone in that office?

16   A    Yes.

17   Q    And, again, we don't have time to watch all the

18   clips, but in terms of where you made phone calls, can you

19   call the lieutenant from that office?

20   A    Yes.

21   Q    You worked -- you worked that 12 to 8 and then you

22   had 8 hours off, and you came back and you worked

23   16 hours, correct?

24   A    Correct.

25   Q    Fair to say there was a lot going on during those

1   three shifts?

2   A    Yes.

3   Q    Is it part of your job to prioritize the things that

4   are going on in your shift?

5   A    Yes.

6   Q    Where does an inmate medical emergency fall on your

7   list of priorities?

8   A    That would be top priority.

9           MS. GILBERT:  No further questions for this

10  witness.

11          We'd ask that she be excused.

12          Thank you, Ms. Moody-Moore.

13          THE COURT:  Ms. Covington, any reason that

14  Ms. Moody-Moore can't be excused?

15          MS. O'BOYLE:  No, Your Honor.  Thank you.

16          THE COURT:  All right.

17          Counsel for Ms. Farley, any reason?

18          MR. EVERHART:  No.  Thank you.

19          THE COURT:  All right.

20          Counsel for Ms. Blackwell, any reason?

21          MR. DINKIN:  That's fine, Judge.

22          THE COURT:  All right.  Thank you.

23          All right, Ms. Moody-Moore.  You are excused.

24  Thank you for coming in today.

25          THE WITNESS:  Thank you.

Lakeshia Barnes – Direct                    1025

1           (Witness stood aside.)

2           THE COURT:  All right, government.  Go ahead and

3    call your next witness.

4           MR. GARNETT:  The United States would call

5    Ms. Lakeshia Barnes, Your Honor.

6           THE COURT:  All right.  Ms. Lakeshia Barnes.

7                     **LAKESHIA BARNES,**

8        called by the government, first being duly sworn,

9                    testified as follows:

10          THE COURT:  All right.  Mr. Garnett, go ahead.

11          MR. GARNETT:  Thank you, Your Honor.

12                  **DIRECT EXAMINATION**

13   BY MR. GARNETT:

14   Q    Good morning, Ms. Barnes.

15   A    Good morning.

16   Q    Could you please introduce yourself to the jury and

17   spell your first and last name for the court reporter.

18   A    My name is Lakeshia Barnes.  First name is spelled

19   L-A-K-E-S-H-I-A.  Last name B-A-R-N-E-S.

20   Q    Ms. Barnes, do you recall where you worked in January

21   of 2021?

22   A    Yes.

23   Q    Where was that?

24   A    FCC Petersburg Medium.

25   Q    Are you here to testify today about your observations