IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:23-cr-68 |
| | ) | |
| SHRONDA COVINGTON, | ) | |
| | ) | |
| *Defendant*. | ) | |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, through its attorneys, Erik S. Siebert, United States Attorney, and Thomas A. Garnett, Assistant United States Attorney; and Harmeet Dhillon, Assistant Attorney General, Kathryn E. Gilbert, Special Litigation Counsel, and Katherine McCallister, Trial Attorney, hereby submits its position with respect to sentencing for defendant Shronda Covington. The United States has reviewed the Presentence Investigation Report, and does not dispute any of the facts or factors set out therein. ECF No. 378. The defendant's applicable Sentencing Guideline range, based on her Total Offense Level of 30 and her Criminal History Category of I, is 97 to 121 months of imprisonment. *Id.* at ¶¶ 69–70. The United States submits that a Guideline sentence would be sufficient, but not greater than necessary, to accomplish the sentencing objectives set forth in 18 U.S.C. § 3553(a).

### I. FACTUAL SUMMARY

W.W. was an inmate in the custody of the Bureau of Prisons at the Federal Correctional Complex at Petersburg. Beginning in the early morning hours of January 9, and continuing until his death on the morning of January 10, W.W. exhibited sudden and severe medical symptoms, including that he was suddenly unable to talk, unable to stand or walk without falling, unable to control his bladder, and apparently unable to understand what was happening to him. W.W. fell

into walls and other objects over and over again, repeatedly striking the walls and floor. At approximately 6:30 a.m. on the morning of January 10, after exhibiting symptoms for over 24 hours, W.W. fell for the last time and lay motionless on the floor. No correctional officer rendered aid to W.W. for nearly an hour and forty minutes. When staff finally responded and called emergency medical technicians, W.W. was pronounced dead.

An autopsy concluded that W.W. died of blunt force trauma to the head and that he sustained multiple skull fractures and extensive scalp hemorrhaging. According to the medical examiner, had W.W. been hospitalized and examined at any point in his ordeal, he could have lived.

Defendant Covington was the operations lieutenant at the medium-security facility, where W.W. was housed, from midnight to 8 a.m. on January 9, 2021. During that time, she was the only lieutenant on duty and the sole official in charge of the institution. At that time of night, when no medical staff are on duty, BOP policy requires correctional officers to report inmate medical issues to the operations lieutenant. Policy then requires the operations lieutenant to respond and to call the on-call physician, send the inmate to the hospital, or both. BOP policy and practice also generally require lieutenants to respond to housing units whenever a housing unit officer requests assistance.

In the early morning hours of January 9, 2021, Correctional Officers Shantae Moody-Moore and Lakeshia Barnes learned from W.W.'s cellmate, and personally observed, that W.W. was suddenly unable to talk, unable to walk normally, unable to control his bladder, and unable to understand these events. Officer Moody-Moore called defendant Covington to report these symptoms and to ask for help. Defendant Covington told Moody-Moore that she would respond to the housing unit. Officer Moody-Moore moved her things from another housing unit to W.W.'s housing unit to await defendant Covington and to continue watching W.W. After W.W. fell and

hit his head on the toilet in his cell, Officer Moody-Moore again called defendant Covington and again requested medical help. Defendant Covington again promised to respond. When defendant Covington failed to respond to W.W.'s housing unit, Officer Barnes walked to defendant Covington's office and again reported W.W.'s symptoms. For a third time, defendant Covington promised to respond.

Despite defendant Covington's repeated promises to comply with BOP policy and practice and respond to W.W.'s housing unit, defendant Covington ultimately ignored the requests of Officers Moody-Moore and Barnes and failed to respond to W.W.'s housing unit. Defendant Covington also failed to send another officer to check on W.W., call the on-call physician, call 911, or take any other action for W.W. Instead, defendant Covington asked Officer Moody-Moore to falsify rounds records to say that defendant Covington had been to W.W.'s housing unit, when in fact she had not. Officer Moody-Moore refused. Defendant Covington left the facility at the end of her shift without taking any meaningful action for W.W.

As a result, W.W. remained in his cell, where he continued to suffer the same symptoms and continued to fall into objects and injure himself. W.W. was eventually removed from his cell and placed in an observation cell, where he continued to exhibit the same symptoms. He fell for the final time the following morning and was later pronounced dead.

When federal agents interviewed defendant Covington about her role in W.W.'s death, she made multiple false statements. First, although defendant Covington admitted that Officer Moody-Moore called her twice about W.W., defendant Covington claimed that, during the first call, Moody-Moore reported only that W.W. was walking around his cell and listening to music. Defendant Covington claimed that during the second call, Moody-Moore reported only that W.W. was doing push-ups. Defendant Covington asserted that Moody-Moore said nothing at any point

3

about W.W. falling, urinating on himself, or eating out of the trash can. Defendant Covington admitted that if she had been told that W.W. was experiencing a medical issue, she was required to respond, but she insisted that she had no information about W.W.'s medical issue. Defendant Covington also denied asking Officer Moody-Moore to falsify rounds records and denied that any other officer talked to her about Walters.

At trial, five witnesses, including Officers Moody-Moore and Barnes, testified about the alarming symptoms W.W. exhibited during defendant Covington's shift. Defendant Covington nevertheless testified that no officer provided her with information about these symptoms. Defendant Covington admitted that Officer Moody-Moore called her, although she repeated the same story she gave federal agents, and testified that Officer Barnes never came to speak with her.

## II. PROCEDURAL SUMMARY

Defendant Covington was charged with violating (1) 18 U.S.C. § 242 by, while acting under color of law as a Bureau of Prisons (BOP) lieutenant, willfully violating the constitutional rights of inmate W.W. by demonstrating deliberate indifference to his serious medical needs (Count One); and (2) 18 U.S.C. § 1001 by making materially false statements to federal agents (Count Six). ECF No. 34.

On December 21, 2024, the jury convicted defendant Covington of both counts. The special verdict form reflects that the jury found that defendant Covington's § 242 violation resulted in W.W.'s bodily injury, but not his death. ECF No. 313.

On April 23, 2025, the U.S. Probation Office issued its final PSR as to the defendant. ECF No. 378. As described below, the United States agrees with the defendant's guideline range, as calculated in his PSR.

The PSR calculated the base offense level for a violation of 18 U.S.C. § 242 pursuant to

U.S.S.G. §2H1.1(a)(1). *Id.* at ¶ 31. Under § 2H1.1(a)(1), the base offense level is determined by applying the "offense level from the offense guideline applicable to any underlying offense," if that offense guideline is greater than the other options given. The PSR correctly cross-referenced U.S.S.G § 2A1.4(a)(2)(A) as the appropriate guideline to determine the base offense level. *Id*. Accordingly, the PSR calculated the defendant's base offense level as 18. *Id*. The PSR also applied a six-level upward adjustment pursuant to § 2H1.1.(b)(1) because the offense was committed under color of law, a two-level upward adjustment pursuant to § 3A1.1(b)(1) because the defendant knew or should have known that W.W. was a vulnerable victim, a two-level upward adjustment pursuant to § 3A1.3 because W.W. was physically restrained during the offense, and a two-level upward adjustment for obstruction of justice pursuant to § 3C1.1, all to reach a total offense level of 30. *Id*. at ¶¶ 32–40. Ultimately, the PSR concluded that the defendant's applicable Guideline range for the underlying offense was 97 to 121 months' imprisonment, based on a total offense level of 30 and a criminal history category of I. *Id*. at ¶¶ 69–70. The PSR identified no factors that would warrant a departure from the applicable Guideline range. *Id*. at ¶ 71.

The Government has no legal or factual objections to the PSR.

Defendant Covington concedes the six-level adjustment for color of law, but objects to several other adjustments applied by the Probation Office.[1] *See id.* at Page A-3–A-6. She also objects to the application of the cross-reference to the involuntary manslaughter guideline, including that her offense involved reckless means.

## III. GUIDELINES ANALYSIS

The Probation Office correctly calculated defendant Covington's guidelines. The United

---

[1] The United States understands, however, that defendant Covington intends to withdraw her objection to the Probation Officer's assessment of a two-point enhancement pursuant to § 3A1.1(b) (vulnerable victim).

States will review defendant Covington's sentencing position paper(s) and further respond to defendant Covington's objections, as appropriate, in the United States' Response pleading.

### A. The Probation Office Correctly Applied the Involuntary Manslaughter Cross-Reference

First, the involuntary manslaughter cross-reference applies to defendant Covington's § 242 conviction because the conduct supporting the "acquitted" offense (death-resulting § 242) overlaps with the conduct supporting the crime of conviction (bodily injury § 242). The conduct is thus relevant conduct pursuant to U.S.S.G. § 1B1.3.

The guideline for the § 242 conviction is U.S.S.G. § 2H1.1, which states that the base offense level is "the offense level from the offense guideline applicable to any underlying offense." The relevant conduct for determining the underlying offense includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." §1B1.3(a)(1) (defining relevant conduct). Section 1B1.3(c) provides that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, *unless such conduct also establishes, in whole or in part, the instant offense of conviction*." (emphasis added). Application note 10 explains that, where "certain conduct underlies both an acquitted charge and the instant offense of conviction . . . the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct."

Here, the conduct giving rise to the acquitted death-resulting penalty enhancement overlaps substantially with defendant Covington's conviction for the bodily injury § 242. If defendant Covington had stopped W.W.'s injuries by sending him to the hospital, he would not have sustained them. Likewise, if defendant Covington had stopped W.W.'s skull fractures or additional skull fractures by sending him to the hospital, he would have lived. W.W. was injured

and died because defendant Covington did nothing to help him, and every fall that occurred after she was notified of W.W.'s ordeal but chose not to respond is the result of her indifference. Accordingly, the acquitted conduct establishes the offense of conviction. As the Sentencing Commission has explained, "any conduct that establishes—in whole or in part—the instant offense of conviction is properly considered, even as relevant conduct and even if that same conduct also underlies a charge of which the defendant has been acquitted." U.S.S.C., "Notice of submission to Congress of amendments to the sentencing guidelines effective November 1, 2024, and request for comment" at 11, *available at* https://www.federalregister.gov/documents/2024/05/03/2024-09709/sentencing-guidelines-for-united-states-courts. Both charges here involve the same elements and the same underlying conduct, so the involuntary manslaughter cross-reference should apply.[2]

Second, under § 2A1.4(b)(2)(A), defendant Covington's conduct was clearly at least reckless. The jury was instructed (ECF No. 317 at PageID 3049) that to find defendant Covington deliberately indifferent, they had to find that she "actually knew of Wade Walters's serious medical need" and that she "disregarded that need by intentionally refusing or intentionally failing to take reasonable measures to address the need." The instructions also required the jury to find that defendant Covington have had "actual knowledge of the risk of harm to the inmate" and that she must have "recognized that her actions were insufficient to mitigate the risk of harm to the inmate arising from his medical need." This demonstrates that the jury found that defendant Covington

---

[2] It is worth noting that, even if the involuntary manslaughter cross-reference did not apply, the base offense level would be the same, because the offense involved two or more participants. § 2H1.1(a)(2) (setting base offense level at 12 "if the offense involved two or more participants"). Defendant Covington's codefendants also willfully violated Walters' constitutional rights by evincing deliberate indifference to his serious medical needs. Although a "participant" "need not have been convicted" for this provision to apply, Lieutenant Michael Anderson (Criminal Case No. 3:23cr80-RCY) was convicted of the same offense (with the death-resulting element) for his role in Walters' injuries and death. *See* § 3B1.1 (defining "participant").

7

"was aware of the risk created by [her] conduct." § 2A1.4 application note.

### B. The Probation Office Correctly Applied a Two-Level Upward Adjustment Because W.W. Was a Vulnerable Victim

The Probation Office correctly applied a two-level adjustment for W.W.'s status as a vulnerable victim. W.W. was "unusually vulnerable due to . . . physical or mental condition [and was] particularly susceptible to the criminal conduct." § 3A1.1(b) & application note 2. Indeed, it is difficult to imagine a victim more vulnerable than W.W.: He could not talk, stand or walk without falling, or control his bladder. According to the witnesses who observed him, he did not appear to understand what was happening. He could not advocate for himself or ask for help. The victim's physical and mental state was comparable to that of a child who could not yet talk. *See United States v. Drapeau*, 110 F.3d 618, 620 (8th Cir. 1997) (holding that vulnerable victim enhancement properly applied where child victim "did not have the physical ability to protect himself . . . [and] could not talk").

Further, defendant Covington knew of the victim's vulnerability, because two correctional officers told her about the victim's symptoms. *See United States v. Llamas*, 599 F.3d 381, 388 (4th Cir. 2010) (stating that, under § 3A1.1(b)(1)'s "two-prong test for assessing the application of the vulnerable victim adjustment . . . a sentencing court must [first] determine that a victim was unusually vulnerable . . . [and, second,] assess whether the defendant knew or should have known of such unusual vulnerability."). Appellate courts have upheld trial courts' application of this enhancement in far less compelling circumstances. *See, e.g.*, *United States v. Harris*, 576 F. App'x 265, 274 (4th Cir. 2014) (upholding application of enhancement where victim was a board-certified anesthesiologist who was also HIV-positive and seeking treatment); *United States v. Stella*, 591 F.3d 23, 30 (1st Cir. 2009) (upholding application of enhancement for patients who could presumably speak and advocate for themselves but who, "had no way to help themselves []

8

because of their pain and their medical conditions, to detect or prevent against the drug dilution").

### C. The Probation Office Correctly Applied a Two-Level Upward Adjustment Because W.W. Was Restrained

The Probation Office correctly applied a two-level upward adjustment for restraint, because W.W. was restrained in ways additional to his lawful detention. The restraint of victim adjustment applies when a victim is "physically restrained in the course of the offense." §3A1.3. "Physically restrained" means "the forcible restraint of the victim," including but not limited to "being tied, bound, or locked up." U.S.S.G. § 1B1.1 cmt. n. 1(K). The Fourth Circuit has held that these and other, less restrictive actions constitute restraint under this provision. *See*, *e.g.*, *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (upholding application of §3A1.3 enhancement where defendant-bank robber moved hostage to a room and physically barred her from leaving); *United States v. Wilson*, 198 F.3d 467, 472 (4th Cir.1999) (holding someone at gunpoint during the commission of an offense, without physical contact or moving the victim into a separate, confined space, can constitute "physical restraint"); *United States v. Little*, 175 F.3d 1017 (4th Cir. 1999) (holding that the defendant's "use of force to control and direct [the victim's] movement against his will amounts to physical restraint."). Additionally, federal courts have applied the restraint adjustment to lawfully incarcerated victims where the victims were restrained in a cell other than their housing unit. *United States v. Wilson*, 686 F.3d 868, 872 (8th Cir. 2012) (upholding application of physical restraint adjustment in a conviction for 18 U.S.C. § 242, where the defendant moved the inmate victims from their regular cells where they were safe to violent cells where they were assaulted).

In this case, the defendant was restrained during the course of the offense. W.W. was not merely locked up as an inmate, but rather subjected to several additional restraints, including when defendant Covington refused to remove W.W. from his cell to be transported for medical care,

when he was handcuffed and transported to the medical unit for assessment, when he was strapped to a medical stretcher and transported to a suicide watch cell, and when he was confined alone inside the locked, single-occupant suicide watch cell for twelve hours until his death. W.W.'s involuntary placement in the suicide watch cell deprived W.W. of his permanent housing unit and its basic comforts, as well as the presence of his cellmate who advocated to get W.W. medical care and attention, and left him in a remote and more restrictive area of the prison to be observed by fellow inmates who themselves were locked in a separate, neighboring room and provided only a phone that could call a single officer for help. Defendant Covington's failure to remove Walters from his cell and/or to obtain medical care for him was a but-for cause of his placement into the suicide observation cell, where he died; this constitutes relevant conduct, as explained above.

Additionally, this enhancement was not subsumed in the offense conduct. *See id.* (concluding that the district court's application of § 3A1.3 did not "result in double counting" because "the specific characteristics punished by § 3A1.3 is physical restraint and not acting under the color of law to deprive a victim of a civil right"); *see also United States v. McCoy*, 480 F. App'x 366, 372–73 (6th Cir. 2012) (rejecting defendants' argument that "restraint is included in the 'under color of law' enhancement" because "the victims were 'physically restrained' by the fact of their pretrial detention" and therefore resulted in "double counting"; holding that "[a]n offense committed under color of law does not necessarily include physical restraint").

### D. The Probation Office Correctly Applied a Two-Level Upward Adjustment for Obstruction of Justice

Defendant Covington was convicted of making false statements to federal investigators investigating this offense. *See*, *e.g.*, *United States v. Williams*, 160 F. App'x 582, 586 (9th Cir. 2005) ("[T]he court properly applied the obstruction of justice enhancement to [the defendant's] sentence pursuant to U.S.S.G. § 3C1.1. [The defendant] was convicted of a separate count for

making a false material statement under 18 U.S.C. § 1001, which is sufficient under U.S.S.G. § 3C1.1, Application Note 5(b) to warrant an obstruction of justice enhancement."). Further, defendant Covington's testimony at the trial—repeating under oath those same false statements for which she was charged and convicted—constituted perjury, a second and independent basis for the application of the § 3C1.1 obstruction enhancement. *See* U.S.S.G. § 3C1.1 n. 4(B).

## IV. Sentencing Recommendation

The Government recommends that this Court impose a sentence within the Guideline range, three years of supervised release, and a $100 special assessment fee. In determining the sentence to be imposed, this Court is guided by the Sentencing Guideline and the factors set forth in 18 U.S.C. § 3553(a). As discussed in greater detail below, a consideration of the Guidelines and the factors set forth in § 3553(a), including the nature, circumstances, and seriousness of the offense, the history and characteristics of the defendant, and the need to afford adequate deterrence, promote respect for the law, and provide just punishment for the offense, weigh in favor of the recommended sentence. Accordingly, the Government respectfully submits that the recommended sentence is warranted and appropriate.

As an initial matter, the Supreme Court has declared that, "[a]s a matter of administration and to secure nationwide consistency, the Guideline should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 50 (2007). While this Court may not presume that a Guideline-range sentence is reasonable, the Sentencing Guidelines remain a significant and pivotal component of the sentencing process. This Court, therefore, "must first calculate the Guideline range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 555 U.S. 350, 351 (2009).

After determining the applicable Guideline range, the Court must consider the sentencing factors enumerated in 18 U.S.C. § 3553(a). Section 3553(a)(1) provides that, in determining a sentence, courts must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Additional factors outlined in section 3553(a)(2) include the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2). In this case, as calculated in the PSR, the defendant's Guideline range is 97 to 121 months. ECF No. 378 at ¶¶ 69–70. The Government believes that, in consideration of the aforementioned factors set forth in 18 U.S.C. § 3553(a), a sentence within the guideline range is sufficient to promote the purposes of sentencing.

### a. The Court Should Impose a Sentence within the Guideline Range Because of the Nature, Circumstances, and Seriousness of the Offense

This Court must consider the "nature and circumstances of the offense" and "the need for the sentence imposed . . . to reflect the seriousness of the offense." 18 U.S.C. § 3553(a)(1), (2)(A). A sentence within the Guideline range is necessary to account for the nature, circumstances, and seriousness of the offense at issue here: the brutal and preventable suffering and death of an inmate in the defendant's care and custody. Defendant Covington was the only lieutenant on duty when W.W.'s ordeal began. Correctional officers repeatedly asked defendant Covington to help W.W. The defendant repeatedly told these officers she would respond to W.W.'s cell to see him, but she failed to do so and left the facility when her shift ended without taking any action for W.W. If defendant Covington had done her job, simply by walking five minutes across the prison compound or picking up the phone to call the on-call physician, she could have saved W.W.'s life. She could have prevented his suffering as he fell into concrete walls and metal furniture with sharp

edges. She could have supported junior officers as they tried their utmost to help W.W. and his cellmate. Instead, she chose, over and over again, to do nothing. Instead, she chose her own comfort and convenience over her duty. As a result, W.W. was left in his cell, where he continued to fall and injure himself. He died of his injuries the following day.

Moreover, the seriousness of the defendant's crime is compounded by her actions after W.W.'s death; namely, her decision to make multiple false statements to federal investigators. The defendant's actions before and after W.W.'s death undermine public trust in corrections officers responsible for the care of persons in their custody. A sentence within the Guideline range will capture the significance of the defendant's acts and omissions, and the lasting harms that those failures inflicted on W.W.; his family members, as reflected in the Victim Impact Statements submitted to the Probation Office; and the larger community. Accordingly, the nature, circumstances, and seriousness of the offense warrant a sentence within the Guideline range. 18 U.S.C. § 3553(a)(1), (2)(A).

### b. A Guideline Sentence Considers the Defendant's Criminal History and Characteristics

Section 3553(a)(1) also directs courts to consider "the history and characteristics of defendant." 18 U.S.C. § 3553(a)(1). At the time of W.W.'s deterioration and death, the defendant was an experienced and high-ranking BOP official. She had years of experience as a corrections officer and as a lieutenant. In that role, she supervised numerous officers, and was responsible for making decisions regarding the care and custody of inmates at the prison, including contacting on-call medical and psychological personnel, transporting inmates to an outside medical facility, or calling 911. This experience and responsibility gave the defendant the knowledge and the training to recognize W.W.'s medical needs and respond appropriately. A sentence within the Guideline range is warranted to account for the defendant's position as a

supervisory corrections officer.

### c. A Guideline Sentence Will Afford Adequate Deterrence, Promote Respect for the Law, and Provide Just Punishment for the Offense

Section 3553(a) also directs the sentencing court to consider the need for the sentence to "afford adequate deterrence," "promote respect for the law," and "provide for a just punishment." 18 U.S.C. § 3553(a)(2)(A), (B). A criminal sentence should take into account general deterrence with respect to other law enforcement officers. 18 U.S.C. § 3553(a)(2)(B). The Fourth Circuit has recognized the importance of general deterrence in fashioning an appropriate sentence in color of law offenses. *United States v. George*, No. 19-4841, 2021 WL 5505404, at *6 (4th Cir. Nov. 24, 2021) (finding probationary sentence of defendant-officer convicted of violating 18 U.S.C. 242 substantively unreasonable, and stressing the "principle that public officials convicted of violating § 242 have done more than engage in serious criminal conduct; they have done so under the color of the law they have sworn to uphold").

A within-Guideline sentence affirms the principles that, first, no one, including federal correctional officers, including supervisory officials, is above the law or the Constitution, and, second, no one, including prison inmates, is undeserving of constitutional protections. The law recognizes that correctional officers' constitutional obligations include an affirmative obligation to protect the lives and safety of those in their custody. A deviation from the Guideline range in this case would send the message that willful dereliction of that duty is not deserving of the sanction that Congress and the Sentencing Commission have deemed to be just punishment based on the federal courts' collective sentencing expertise accumulated over the decades. A within-Guideline sentence will thus serve to protect the American public not only by affording adequate deterrence, but by promoting respect for the law and these paramount constitutional duties.

### d. A Downward Departure is Unwarranted

The government, like the Probation Office, has not identified any factors that would support a departure from the applicable guideline range. The defendant's characteristics and history are already contemplated by the Guideline calculation and are not an appropriate basis for a downward departure. *See United States v. Rybicki*, 96 F.3d 754, 759 (4th Cir. 1996) (noting defendant's history of service and family circumstances but stating that because these factors were not "present to an 'exceptional' degree, they may not form the basis for a downward departure.").

## V. CONCLUSION

Based on the factors set forth in 18 U.S.C. § 3553, the Government respectfully requests that this Court sentence the defendant to a sentence within her properly computed Guideline range of 97 to 121 months' imprisonment, to be followed by three years of supervised release.

Respectfully submitted,

Sincerely,

Erik S. Siebert
United States Attorney

By: _____/s/_____
Thomas A. Garnett
Assistant United States Attorney


Harmeet Dhillon
Assistant Attorney General

By: /s/ Kathryn E. Gilbert_____
Kathryn E. Gilbert
Special Litigation Counsel
Katherine McCallister
Trial Attorney
Criminal Section
Civil Rights Division