IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>SHRONDA COVINGTON, )<br>Defendant. )<br>_____ ) | Criminal Case No. 3:23CR68-1 (RCY) |

## <u>MEMORANDUM OPINION</u>

This prosecution arose following the death of an inmate ("W.W.") in federal prison.  At the conclusion of an eleven-day trial, the jury found Defendant Shronda Covington and one of her two co-defendants guilty of various charged offenses.  The matter is before the Court on Ms. Covington's Corrected Motion for New Trial ("Motion for New Trial"), ECF No. 363.[1]  Therein, Ms. Covington argues that the Court should grant a new trial under Federal Rule of Criminal Procedure 33(a), based on *Brady*/*Giglio* and Jencks violations, the Government's use of perjured testimony, prosecutorial misconduct during closing argument, and the prosecution team's personal animus towards Ms. Covington.  The Government disputes Ms. Covington's arguments and contends that it acted appropriately prior to, during, and after the trial.  For the following reasons, the Court denies Ms. Covington's Motion for a New Trial.[2]

---

[1] Ms. Covington filed both a redacted and an unredacted version of her Corrected Motion for New Trial. ECF Nos. 351 (unredacted), 363 (redacted).  The Court provides citations to the unredacted version of the Motion, though where needed it references the exhibits appended to the redacted version, as Ms. Covington did not re-append those to the unredacted filing.

[2] On May 5, 2025, the Court entered an Order denying the Motion and promising an opinion to follow.  Order, ECF No. 397.  This Memorandum Opinion fulfills that promise.

# I. RELEVANT BACKGROUND

On August 1, 2023, the grand jury issued a six-count Superseding Indictment specifically charging Ms. Covington with one count of deprivation of rights under color of law resulting in bodily injury and/or death, in violation of 18 U.S.C. § 242 (Count One) and one count of making false statements, in violation of 18 U.S.C. § 1001 (Count Six). Superseding Indictment, ECF No. 34. Ms. Covington and her two co-defendants proceeded to trial on December 9, 2024. On December 21, 2024, the jury returned a verdict finding Ms. Covington guilty of deprivation of rights resulting in bodily injury, but not death (Count One) and of making false statements (Count Six). Verdict Form, ECF No. 313.

On March 17, 2025, Ms. Covington filed a Motion for a New Trial, ECF No. 345, but shortly thereafter, filed a (redacted) Corrected Motion for a New Trial, ECF No. 351, superseding the earlier motion. Upon receiving approval from the Court, she later filed an unredacted version under seal. ECF No. 363. Ms. Covington also filed a Motion to Adopt the arguments presented by co-Defendant Tonya Farley in Ms. Farley's Motion for a New Trial, ECF No. 349, which the Court granted, ECF No. 350. The Government responded to Ms. Covington's primary Motion with its own redacted opposition brief on March 31, 2025, ECF No. 356, followed shortly thereafter with an unredacted Response in Opposition, ECF No. 364. Ms. Covington replied on April 7, 2025. ECF No. 368. On April 11, 2025, the Court granted the Government leave to file an Amended Response in Opposition. ECF No. 371. That same day, the Government filed its redacted Amended Response in Opposition, ECF No. 372, and its unredacted Amended Response in Opposition. Am. Resp. Opp'n ECF No. 373. The Amended Response does not change any of the Government's legal arguments and instead simply corrected the record on an ancillary issue, *see* Mot. Leave, ECF No. 370; as such, Ms. Covington did not file or move to file an amended

reply. The Motion for New Trial is accordingly ripe for review. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process.

## II. STANDARD OF REVIEW

Federal Rule of Criminal Procedure 33 allows a court, upon the defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A court is not required to view the "evidence in light most favorable to the government," thus the court's authority is "much broader than when it is deciding a motion to acquit." *United States v. Rafiekian*, 991 F.3d 529, 549 (4th Cir. 2021) (quoting *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985)). "Nevertheless, the 'standard for jettisoning a jury verdict in favor of a new trial' remains 'demanding,' and courts must exercise their discretion to do so 'sparingly.'" *Id.* (quoting *United States v. Millender*, 970 F.3d 523, 531–32 (4th Cir. 2020)). "A new trial is warranted only '[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment.'" *Millender*, 970 F.3d at 531 (quoting *Arrington*, 757 F.2d at 1485).

## III. DISCUSSION

Ms. Covington makes four primary arguments in her Motion for a New Trial. First, Ms. Covington argues that the Government concealed pivotal *Brady*/*Giglio* material relating to ███████████████████ and to government and defense witnesses. Mot. New Trial 3, 15. Relatedly, Ms. Covington suggests that the Government still has not met its obligations under *Brady* and the Jencks Act. *Id.* at 18. Next, Ms. Covington contends that the Government knowingly used false testimony to convict Ms. Covington, specifically that the Government mispresented facts about an alleged phone call between Nurse Woolridge and Dr. Young and presented, or failed to correct, false testimony from Officer Moody-Moore, Special Agent

Whitney, Dr. Biber, Associate Warden Wilson, and Special Investigative Agent Norman. *Id.* at 20–21. Third, Ms. Covington asserts that the prosecutor's actions during closing argument constituted misconduct because she inflamed the passions of the jury and misrepresented facts to the jury. *Id.* at 36–37. Lastly, Ms. Covington proffers that the prosecution team's palpable disdain for Ms. Covington, evidenced by the circumstances of Ms. Covington's arrest and the Department of Justice's press release post-trial, also warrants a new trial. *Id.* at 43–48. In sum, Ms. Covington claims that each violation by itself undoubtably merits a new trial, and further that, when examined in its entirety, the Government's conduct entitles Ms. Covington to a new trial. *Id.* at 48–49.

The Government naturally disagrees. In response to Ms. Covington's motion, the Government contests the allegations that it violated *Brady*/*Giglio* and the Jencks Act or that it used perjured or false testimony. Resp. Opp'n 4. The Government further contends that, even if the Court were to find that those alleged violations in fact occurred, a new trial is not warranted based on the controlling legal standard. *See id.* The Government also disagrees with Ms. Covington's portrayal of the Government's closing argument and the prosecution team's alleged animus towards Ms. Covington. Finally, the Government notes that its closing argument was neither misleading nor improper and that Ms. Covington's argument that animus may support the granting of a new trial is without basis in law or fact. *Id.*

For the reasons set forth below, the Court does not find that a new trial is warranted based on either the circumstances of this case or controlling legal standards.

## A. *Brady*, *Giglio,* and Jencks Act Violations

Ms. Covington makes three primary arguments relating to the Government's alleged *Brady*, *Giglio*, and Jencks Act violations: (1) the Government improperly withheld information relating to ██████████████████ in violation of *Brady*; (2) the Government failed to disclose

any agreements between the Government and Dr. Biber, Officer Lofton, and Lieutenant Boxley, in violation of *Giglio*; and (3) the Government is still in possession of undisclosed documents that constitute *Brady* and Jencks Act materials. Mot. New Trial 10, 15, 18. Before engaging with these arguments, the Court will provide an overview of the applicable law.

There is no general Constitutional right to discovery in a criminal case. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59–60 (1987). The rule set forth in *Brady v. Maryland*, 373 U.S. 83 (1963), requires only that prosecuting attorneys disclose any evidence that is exculpatory and is "material" to the defendant. *See generally id*. Evidence that is not exculpatory but which serves to impeach the credibility of a Government witness also must be disclosed if it is material. *See Giglio v. United States*, 405 U.S. 150, 154 (1972). Evidence tending to affect the credibility of a government witness is therefore typically referred to as "*Giglio* material," after the case that created the rule mandating its disclosure. *See United States v. Beckford*, 962 F. Supp. 780, 786 (E.D. Va. 1997). Because *Giglio* material is simply a subset of *Brady* material, the disclosure of *Giglio* material is subject to the same analytical structure as *Brady* evidence. *See id*. (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The material exculpatory or impeaching evidence must be disclosed to the defendant "in time for its effective use at trial." *Beckford*, 962 F. Supp. at 788.

Meanwhile, the Jencks Act requires the Government to produce certain witness statements "in the possession of the United States which relate[] to the subject matter" on which the Government's witness has testified. 18 U.S.C. § 3500(b). "[T]he Jencks Act defines 'statement' to include both 'a written statement made by said witness and signed or otherwise adopted or approved by him' and 'a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously.'" *United States v. Savage*, 885 F.3d 212, 220 (4th Cir. 2018) (internal citations omitted); *see also United States v. Boyd*, 53 F.3d 631, 635 (4th Cir. 1995)

(affirming the district court's determination that the statement did not constitute a Jencks Act "statement" because:  "(1) there was no indication in the record that [the witness] ever reviewed or approved the contents of the report; and (2) the report was not a substantially verbatim transcription of the [] meeting."); *United States v. Hinton*, 719 F.2d 711, 715–716 (4th Cir 1983) ("[A] witness' statement 'is not a statutory "statement" unless it reflects the witness' own words fully and without distortion' and is to be treated as such 'only upon a 'finding of unambiguous and specific approval' of specific notes.'" (quoting *Goldberg v. United States*, 425 U.S. 94, 112, 125 (1976))).

The remedy in a case where the prosecution fails to timely disclose material evidence required by *Brady* and *Giglio* is typically an order for a new trial.  *See United States v. Derrick*, 163 F.3d 799, 809 (4th Cir. 1998) ("Thus, any prejudice that arguably existed as a consequence of discovery violations is fully remedied by this court's orders of new trials.").  To obtain such relief, the convicted defendant must show that "the undisclosed evidence was (1) favorable to [her] either because it is exculpatory, or because it is impeaching; (2) material to the defense, *i.e.*, prejudice must have ensued; and (3) that the prosecution had [the] materials and failed to disclose them." *United States v. Wolf*, 860 F.3d 175, 192 (4th Cir. 2017); *see also United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015) (citing *Giglio v. United States*, 405 U.S. 150, 153–54 (1972) (noting that material impeachment information is also encompassed within the *Brady* rule).  Likewise, in the event of a Jencks Act violation, if the Court finds that the defendant suffered prejudice, the appropriate remedy is a new trial.  *E.g.*, *United States v. Gibson*, 328 F. App'x 860, 864 (4th Cir. 2009) (affirming ordering of new trial based on Jencks Act violation); *cf. United States v. Butler*, 85 F. App'x 953, 954 (4th Cir. 2004) (citing *United States v. Schell*, 775 F.2d 559, 567 (4th Cir. 1985)) ("Violations of the Jencks Act constitute harmless error where no prejudice results to the

defense."); *id.* (citing *Schell*, 775 F.2d at 567) (an error may be harmless when the alleged Jencks material was duplicative of "other information provided to the defense").

    1.  *Brady* Material Relating to █████████████████

    Ms. Covington contends that the Government withheld essential *Brady* information pertaining to the circumstances of █████████████ and then misrepresented those facts to the Court.  Mot. New Trial at 10; *see* Mot. New Trial Ex. A, ECF No. 351-1 (e-mail in Special Agent Whitney's possession █████████████, dated May 19, 2023); Pretrial Hrg. Tr. 68:25–73:17, ECF No. 340 (December 6, 2024 pretrial conference ███████████ ██████████████████████████████████████████████████████).  Specifically, Ms. Covington argues that the prosecution team never produced information about ███████████████ despite requests from defense counsel eight months earlier.  Mot. New Trial 13.  She also argues that the prosecution presented inaccurate information to the Court at the December 6, 2024 pretrial conference about ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████.  Reply 4 n.3; *id.* at 1–4; Mot. New Trial 10–11, 13–15.  Finally, Ms. Covington argues that ████████████████ only spurred on the prosecution team's wrongful pursuit of her.  Mot. New Trial 14–15.

    The Government disagrees on all fronts.  First, the Government points out that Ms. Covington had the e-mail in question before trial began and argues that this fact alone forecloses any argument of a *Brady* violation.  Am. Resp. Opp'n 5–6.  The Government contends that the prosecution team did not "hide" anything because it is not, and has never been, in possession of █████████████ and that no member of the prosecution team is aware of an investigation into ███████████████.  *Id.* at 5.  It is the Government's position, as was its position eight months

ago, that neither ████████████████████████ nor ████████████ is relevant or admissible in this case. *Id.* The Government highlights that any implication that ████████████ ████████████████ has no exculpatory value toward Ms. Covington. *Id.* The Government also argues that the Defendant failed to establish how the e-mail was relevant to Special Agent Whitney's credibility because Ms. Covington was never foreclosed from arguing that Special Agent Whitney unreasonably directed her attention towards Ms. Covington. *Id.* at 7. The Government further disputes Ms. Covington's suggestion that it misrepresented facts to the Court about ████████████████, reiterating that, ████████████████████████████████ ████████████. *Id.* at 7–8. Lastly, the Government asserts that, regardless of the information contained within the e-mail highlighted by the defense, the e-mail is inadmissible as hearsay because Special Agent Whitney lacks personal knowledge. *Id.* at 8–9.

The Court's analysis with respect to this alleged *Brady* violation starts and stops at the question of materiality. *See Wolf*, 860 F.3d at 192 (to be entitled to the relief of a new trial on a *Brady* violation, the movant must establish, *inter alia*, that the unproduced information was "material to the defense, *i.e.*, prejudice must have ensued"). Evidence is material when there is a "reasonable probability that its disclosure would have produced a different result." *Parker*, 790 F.3d at 558 (quoting *United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013)). This reasonable probability standard is met if "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Id.* (quoting *Bartko*, 728 F.3d at 340). Impeachment evidence may be "material when the witness in question 'supplied the only evidence of an essential element of the offense,' especially if the undisclosed evidence was the only significant impeachment material." *Id.* (quoting *Bartko*, 728 F.3d at 339). However, impeachment evidence is not material when it is cumulative of evidence of bias or partiality already presented and thus

would have provided only marginal additional support for the defense." *Id.* (quoting *Bartko*, 728 F.3d at 339).

Ms. Covington primarily argues that the e-mail is material because it is probative of the prosecution's and Special Agent Whitney's motivation(s) and it illuminates how OIG conducted its investigation,[3] *see* Mot. New Trial 10–15; Reply 1–4, which the Court interprets as asserting that the e-mail would have served as vital impeachment evidence. The Court is not persuaded. While the e-mail might have some bearing on that issue, that specific line of questioning was not otherwise foreclosed to Ms. Covington. Indeed, the Court addressed that exact issue during the pretrial conference. *See* Pretrial Hrg. Tr. 72:24–73:17, ECF No. 340 (pretrial ruling permitting cross of Special Agent Whitney regarding her service of a target letter on Lieutenant Arkin). And, as the Government correctly points out, Ms. Covington did cross examine Special Agent Whitney about the timing of ███████████████ and Special Agent Whitney's conduct throughout the course of the investigation. Am. Resp. Opp'n 7 n.2; Trial Tr. 1490:5–13, ECF No. 333 (Covington's cross examination of Special Agent Whitney regarding service of target letter upon Lieutenant Arkin and Arkin's subsequent death); *see also* Trial Tr. 2979:16–2982:7, ECF No. 338 (Covington's closing argument, advocating that Special Agent Whitney "did not investigate this case on a truth-seeking mission" and that she bore "personal animus towards Ms. Covington," as evidenced by the nature of Ms. Covington's arrest).

---

[3] Ms. Covington does not argue that the e-mail is material as "the only evidence of an essential element of the offense." *Parker*, 790 F.3d at 558. Nor could she make that argument, as ███████████████ and the contents of the e-mail are not relevant to the whether Ms. Covington made false statements or deprived W.W. of his rights under color of law. To the extent that her Reply suggests that ███████████████ ████, it is unclear how it does so, nor would that be appropriate evidence, even if it were true. *See United States v. Etsitty*, 130 F.3d 420, 423–424 (9th Cir. 1997); *United States v. Ribaudo*, 326 F. App'x 870, 874–75 (5th Cir. 2009). ███████████████████████████ has no bearing on Ms. Covington's culpability.

9

Based on the availability of cross examination and the testimony solicited from Special Agent Whitney and others at trial, the Court finds that any additional evidence pertaining to ████████████████████████ "would have provided only marginal additional support for the defense." *Parker*, 790 F.3d at 558. More critically, it would have been cumulative of the other evidence presented regarding Special Agent Whitney's or OIG's supposed bias in conducting its investigation and focusing that investigation on Ms. Covington. *See id.* Thus, the e-mail is not material under *Brady*, and the fact of its non-introduction[4] at trial does not merit a new trial.

2. *Giglio* Material Relating to Lacie Biber, Noah Lofton, and Derone Boxley

Ms. Covington next argues that the Government failed to provide *Giglio* and *Brady* material as to Lacie Biber ("Dr. Biber"), Noah Lofton ("Officer Lofton"), and Derone Boxley ("Lieutenant Boxley"). Mot. New Trial 15–16. In particular, the Defendant argues that the Government's decision to forgo charging these individuals criminally constituted a benefit conferred upon them in exchange for their testimony and that, by not disclosing this decision to the Defendant, the Government prevented Ms. Covington from cross-examining Dr. Biber, Officer Lofton, or Lieutenant Boxley about this benefit. *Id.* at 16–17.

In response, the Government first notes that it did not disclose any non-prosecution agreements or immunity agreements because there were none. Am. Resp. Opp'n 10. Moreover, prosecution decisions are neither discoverable nor admissible. *Id.* Even if an *implied* non-prosecution agreement existed, the Government argues, the Fourth Circuit has not addressed the

---

[4] Although Ms. Covington vigorously contends that it was the Government's alleged misrepresentations regarding its possession of the May 19, 2023 e-mail and the existence of ████████████ that led to the Court's ruling excluding ████████████████████ at trial, that is not the case. The specific fact ████████████████████████████████████████████████████████████, bears no relation on whether or not Ms. Covington committed the charged offenses. Thus, the Court's prior ruling—that any such information was not relevant and thus not appropriate for introduction at trial—stands.

implications of any such implied agreement. *Id.* Lastly, the Government proffers that even if there was an implied agreement, which there wasn't, Ms. Covington failed to satisfy any of the elements to establish a *Brady*/*Giglio* violation. *Id.* at 11. In particular, the evidence supporting Ms. Covington's current argument was available to her prior to cross-examining Dr. Biber. *Id.* Further, the Government points out that Ms. Covington did not, at any point, cross-examine Dr. Biber or ask her own witnesses, Officer Lofton and Lieutenant Boxley, about any benefit they may have received. *Id.* Regardless, the Government notes that Ms. Covington also failed to establish how this information would be material to her case. *Id.*

As an initial matter, Ms. Covington proffered in her Reply that she did not ask Dr. Biber, Officer Lofton, or Lieutenant Boxley information about immunity because she needed to have a "good faith basis" to do so. Reply 5. However, Ms. Covington does not lay out or address any newly discovered evidence to bolster her current argument that a tacit agreement existed between the Government and Dr. Biber, Officer Lofton, and Lieutenant Boxley. *See* Mot. New Trial 15–17; Reply 5–6. Therefore, it is unclear to the Court how the Defendant now has a "good faith basis" to raise the question, if she did not have one at trial.

Turning to the remainder of the Defendant's arguments, the Court is not persuaded that any *Brady* or *Giglio* violation occurred with respect to the Government's prosecutorial decisions. Although the Fourth Circuit has not explicitly addressed tacit agreements, at least five other circuits have. *See Shabazz v. Artuz,* 336 F.3d 154, 165 (2d Cir. 2003); *Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008); *Wisehart v. Davis*, 408 F.3d 321, 324–25 (7th Cir. 2005); *Douglas v. Workman*, 560 F.3d 1156, 1186–87 (10th Cir. 2009); *United States v. Rodriguez*, 766 F.3d 970, 988–89 (9th Cir. 2014). The Court finds persuasive the reasoning of these courts, which generally found that "'[t]he government is free to reward witnesses for their cooperation with favorable

11

treatment . . . without disclosing to the defendant its intention to do so, *provided* that it does not promise anything . . . prior to their testimony.'  To conclude otherwise would place prosecutors in [an] untenable position."  *Bell*, 512 F.3d at 234 (quoting *Shabazz,* 336 F.3d at 165)); *accord Shabazz*, 336 F.3d at 165 ("[T]he fact that a prosecutor afforded favorable treatment to a government witness, standing alone, does not establish the existence of an underlying promise of leniency in exchange for testimony."); *Wisehart*, 408 F.3d at 325 ("Without an agreement, no evidence was suppressed, and the state's conduct, not disclosing something it did not have, cannot be considered a *Brady* violation."); *Douglas*, 560 F.3d at 1187 (citing *Bell*, 512 F.at 223, and *Shabazz,* 336 F.3d at 162, for the proposition that "favorable treatment for a witness is insufficient to show an agreement between the prosecution and the witness," while ultimately finding that "more than merely favorable treatment" existed in the case at bar); *Rodriguez*, 766 F.3d at 988–89 (concluding that no Brady violation occurred because, despite post-testimony favorable treatment, i.e., the filing of a Rule 35 motion for sentence reduction, there was no evidence of a tacit agreement)

Here, the Court agrees that there is no evidence of an implied or direct agreement.  The Defendant's position that she did not have a good faith basis to cross-examine or direct witnesses on this issue during trial, *see* Reply 5, only supports the Court's finding, as the Defendant has not identified any new information to support her argument of any implied or implicit agreement.  Finally, the Court notes that it instructed the jury as follows:

> You are here to determine whether the Government has proven the guilt of the Defendants for the charges in the superseding indictment beyond a reasonable doubt.  You are not called upon to return a verdict as to the guilt or innocence of any other person or persons.
>
> So, if the evidence in the case convinces you beyond a reasonable doubt of the guilt of the Defendants for the crimes charged in the superseding indictment, you should so find, even though you may believe that one or more other unindicted persons are also guilty. But if any reasonable doubt remains in your minds as to a

crime charged, after impartial consideration of all the evidence in the case, it is your
duty to find the Defendant not guilty as to that charge.

Jury Instr. 11, ECF No. 317. The Defendant's lack of evidence of any agreement leads the Court

to conclude that no *Brady* or *Giglio* violation occurred. But even if such an agreement existed, the

Defendant has not established a "reasonable probability that its disclosure would have produced a

different result" at trial, *Parker*, 790 F.3d at 558 (quoting *Bartko*, 728 F.3d at 340), particularly in

light of the above-quoted Instruction, *see Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985) ("The

Court presumes that jurors, conscious of the gravity of their task, attend  closely the particular

language of the trial court's instructions . . . and follow the instructions given them."); *United*

*States v. Brewbaker*, 87 F.4th 563, 583–84 (4th Cir. 2023) ("[W]e operate under the 'crucial

assumption that jurors carefully follow instructions.'" (quoting *United States v. Rafiekian*, 991

F.3d 529, 550 (4th Cir. 2021))). Thus, the Court further finds that, even if any such agreement

existed, its non-disclosure would not be material, and thus no new trial is warranted pursuant to

*Brady* or *Giglio*.

### 3. *Brady* and Jencks Act Material in OIG Files

Lastly, Ms. Covington argues that "it is clear that the Prosecution Team has not disclosed

all *Brady* and Jencks Act material" in DOJ-OIG's possession regarding their witness Special Agent

Whitney. Mot. New Trial 18. Ms. Covington argues that her Rule 17 subpoena request, which

was handled by a Civil Division Trial Attorney, was demonstrative of this issue, insofar as the

Government's subsequent Rule 17 production contained information that Ms. Covington used

during trial and—of particular interest—the e-mail regarding ███████████████. *Id.* at

18–19; *see* Mot. New Trial Ex. A, ECF No. 351-1 (May 19, 2023 e-mail in Special Agent

Whitney's possession ██████████████████). Ms. Covington critiques the prosecution

for: (1) not producing these documents voluntarily under *Brady* and the Jencks Act; and (2) the

13

actual manner in which the Civil Division Trial Attorney produced the documents.  Mot. New Trial 18–19.

Ms. Covington highlights that even though the United States Marshals served OIG with Ms. Covington's Rule 17 subpoena request in May 2024, the Government's first production was not made until November 15, 2024.  *Id.*  The second production occurred on November 27, 2024, and the final production, which included ██████████████████████████████, was provided to Ms. Covington on December 6, 2024, i.e., the Friday before trial, at 5:27 p.m.  *Id.*  The final production was also five days after the Court-imposed *Giglio*/Jencks deadline.  *See* Disc. Order 5–6, ECF No. 46.  Ms. Covington argues that but for her Rule 17 subpoena, the prosecution would never have disclosed the e-mail ████████████████████████, despite her request for information about the issue.  *Id.*  Lastly, Ms. Covington comments that DOJ-OIG withheld a number of documents either without any basis or under the "law enforcement privilege" or the "deliberative process privilege."  *Id.* at 18.  With respect to the aforementioned files, Ms. Covington challenges the fact that DOJ-OIG failed to provide a privilege log despite Ms. Covington's request for one.  *Id.*

The Government contends that Ms. Covington has not identified any undisclosed or suppressed evidence, and that speculation about allegedly suppressed materials cannot establish a *Brady* violation.  Resp. Opp'n 12.  The Government posits that any argument about ███████████ ████████████ fails for the same reasons explained earlier:  it was in fact disclosed before trial, and it is not material.  *Id.*  Finally, the Government disputes Ms. Covington's position that every e-mail from Special Agent Whitney regarding this case needed to be disclosed.  *Id.*

First, the Court agrees that Ms. Covington fails to plausibly establish that the Government has undisclosed *Brady* and Jencks material in its possession that would be favorable to Ms.

Covington. There is no *Brady* violation when there is "no record evidence to the contrary" and a Defendant offers no more than "rank speculation as to the nature of the allegedly suppressed materials." *United States v. Young*, 916 F.3d 368, 383–84 (4th Cir. 2019). Although Ms. Covington makes a strong argument that the Government's behavior has been evasive, she "can only speculate as to what the requested material might reveal," and therefore "[s]he cannot satisfy *Brady*'s requirement of showing that the requested evidence would be favorable to the accused." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010); *see also id.* ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (quoting *United States v. Agurs*, 427 U.S. 97, 109–10 (1976))). Ms. Covington's argument fails similarly under the Jencks Act, as "[t]he Act does not authorize fishing expeditions by the defendant." *Boyd*, 53 F.3d at 635 (quoting *Unites States v. Graves*, 428 F.3d 196, 199 (5th Cir. 1970)).

Further, Ms. Covington offers no legal basis for her argument that the Government's failure to provide a privilege log constitutes either a *Brady* violation or a Jencks Act violation, or that such failure otherwise mandates a new trial. *See* Mot. New Trial 18–20; Reply 1–3. The Court will therefore not expend much ink on this point, other than to note that Ms. Covington is not entitled to every single document she desires to inspect. *See Boyd*, 53 F.3d at 635 ("The [Jencks] Act does not authorize a fishing expedition by the defendant" (quoting *Graves*, 428 F.3d at 199)); *Caro*, 597 F.3d at 619 ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." (quoting *Weatherford v. Bursey*, 429 U.S. 545 (1977))).

Finally, while the timing and manner of the Government's disclosure of the e-mail regarding ████████████ and other subpoena-responsive discovery is not outcome-

15

determinative for purposes of a *Brady*[5] analysis, *see United States v. Smith Grading and Paving, Inc.*, 760 F.2d 527, 532 n.6 (4th Cir. 1985) (finding that the timing of when the defendant received exculpatory information is irrelevant, so long as "the defendant was able to effectively use the exculpatory information"), the Court will nevertheless address the Government's conduct.

On June 7, 2023, Magistrate Judge Colombell issued a Due Process Protection Act Order confirming the Government's obligation to "disclose to the defendant all exculpatory evidence, that is, evidence that favors the defendant or casts doubt on the United States' case, as required by *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny." Order, ECF No. 12. The May 19, 2023 e-mail possibly satisfied the first step for *Brady* qualification, insofar as it was "favorable information," "either because it was exculpatory or because it was impeaching." *Parker*, 790 F.3d 558–558 (finding evidence of potential bias met *Brady*'s first step). Thus, it should arguably have been produced in accordance with the Due Process Protections Act Order. However, as the Court found above, *supra* Part III.A.1, the Government's failure to do so still does not rise to the level of a *Brady* violation, because the e-mail does not satisfy the materiality prong of *Brady*. The Court further notes that "'the *Brady* rule does not apply if the evidence in question is available to the defendant from other sources,' either directly or via investigation by a reasonable defendant." *United States v. Brothers Constr. Co. of Ohio*, 219 F.3d 300, 316 (4th Cir. 2000) (quoting *United States v. Wilson*, 901 F.2d 378, 380 (4th Cir. 1990)). Here, the Defendant's reasonable investigation, i.e., use of subpoenas, enabled her to obtain the e-mail that is now so hotly contested,

---

[5] The e-mail does not constitute a statement under the Jencks Act because Ms. Covington does not even contend that Special Agent Whitney "ever reviewed or approved the contents" of the e-mail and there is no evidence that the e-mail was a "substantially verbatim transcription" of any conversation with Special Agent Whitney. *Boyd*, 53 F.3d at 635.

even if she did not receive it in as timely a manner as she might prefer.  As such, other potential consequences notwithstanding,[6] a new trial is not warranted on this ground.

**B.  Knowing Use of False Testimony**

Ms. Covington next argues that the Government presented false testimony, that it knew its witnesses falsely testified, and that it failed to correct the record, and on this ground, the Court should grant a new trial.  Mot. New Trial 20–21.

A new trial is required when the Government knowingly uses false testimony that could "affect the judgment of the jury," or, more specifically, when the use of false testimony "create[ed] a false impression of material fact."  *United States v. Briscoe*, 101 F.4th 282, 298 (4th Cir. 2024).  The defendant "bears 'the heavy burden of showing that [a witness] testified falsely.'"  *Id.* (quoting *United States v. Griley*, 814 F.2d 967, 971 (4th Cir. 1987)).  However, a witness changing their story or one who has "credibility problems" or is otherwise "unreliable" does not equate to false testimony.  *Id.* (citing *Griley*, 814 F.2d at 971).  Paramount to this determination is the defense's ability to cross-examine the witness.  *See, e.g.*, *id.* at 299 ("[The defendant] had an opportunity to challenge the credibility of these witnesses on cross examination.  The jury heard the testimony, including the cross examination, weighed the evidence, including the reliability of the witnesses, and convicted [the defendant].").  In the event a court were to find that the statements relied on were not mere inconsistencies, the court would need to assess the statements under what is known as the *Napue* standard.  This requires a showing of (1) falsity, (2) materiality of the testimony, and (3) the prosecutor's knowledge of the statement's falsity.  *Juniper v. Davis*, 74 F.4th 196, 211 (4th Cir. 2023) (citing *Napue v. Illinois*, 360 U.S. 264 (1959)).  A statement is material "if there is *any*

---

[6] E.g., contempt or other sanctions.  *See* Covington Due Process Prot. Act Order, ECF No. 12 ("Failure to disclose exculpatory evidence in a timely manner may result in serious consequences, including, but not limited to, . . . contempt proceedings, disciplinary action, or sanctions by the Court."); Am. R. 17 Subpoena, ECF No. 212-1 (quoting Fed. R. Crim. P. regarding contempt as penalty for failing to disobeying a subpoena).

*reasonable likelihood* that the false testimony *could have affected* the judgment of the jury." *Id.* at 211–12 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

Ms. Covington argues that the following individuals testified falsely: Officer Moody-Moore, Special Agent ("SA") Whitney, Special Investigative Agent ("SIA") Norman, Dr. Biber, and Associate Warden Wilson. Additionally, she argues that the Government misrepresented the content of certain phone records. The Court addresses each aspect of the challenged evidence, below, ultimately finding that the testimony and evidence amount to inconsistencies rather than perjured testimony.

### 1. Moody-Moore

According to Ms. Covington, Officer Moody-Moore perjured herself six times. Mot. New Trial 21–23. The specifically challenged testimony includes: what phone Officer Moody-Moore used to report W.W.'s symptoms to Ms. Covington, *id.* at 21–22; why she quit her job, *id.* at 22; whether she met with Associate Warden Wilson, *id.* at 22–23; whether she knew that her memo got Ms. Covington "walked out," *id.* at 23; her impressions of W.W. and whether he needed a mood stabilizer, *id.*; and whether she actually took contemporaneous notes during W.W.'s ordeal. Ms. Covington identified other witnesses' statements, Ms. Moody-Moore's sworn statement from September 29, 2021, and the Government's objection to the introduction of Officer Moody-Moore's notes as proof that the Government relied on false testimony. *See id.* at 21–23. Ms. Covington argues that these false statements are material because Officer Moody-Moore's credibility was paramount to the case. *Id.* at 23.

In response, the Government highlights Fourth Circuit case law that distinguishes between false testimony and inconsistent statements. Am. Resp. Opp'n 13. The Government points out that the proof offered by Ms. Covington does not show that Officer Moody-Moore testified falsely

or even inconsistently, depending on how the jury credited each witness. *See id.* at 16–17. The Government offers explanations for how Officer Moody-Moore's statements were not necessarily inconsistent and reiterates that there were multiple witnesses, including Ms. Covington herself, who corroborated aspects of Officer Moody-Moore's testimony. *Id.*

The Court does not find that the Government presented false testimony through Officer Moody-Moore that "create[ed] a false impression of material fact." *Briscoe*, 101 F.4th at 298. Specifically, the Defendant has not met her burden of proving that the testimony was in fact false. The Court will first address the testimony about what phone Officer Moody-Moore used during her first phone call to Ms. Covington before addressing Ms. Covington's argument about Officer Moody-Moore's contemporaneous notes. The Court will then address the remaining statements that Ms. Covington alleges amount to perjured testimony.

### a. *Phone Used by Moody-Moore*

First, with respect to which phone Officer Moody-Moore used to place her first call to Ms. Covington, the witness admitted that she does not remember where she called from, and the Government acknowledged as much in its closing argument. Trial Tr. 996:16–997:7, ECF No. 332 (Officer Moody-Moore testimony); Trial Tr. 3113:15–17, ECF No. 338 (Government's closing argument). To the extent, Ms. Covington argues it was inappropriate for the Government to suggest that the first call did not originate from the desk in the middle of the unit, the Government was not forbidden from making this argument. The Government was entitled to present its theory of the case, even if that theory was predicated on an interpretation of record evidence with which Ms. Covington clearly disagrees. *See* Trial Tr. 2966:1–67:20 (Covington closing argument, presenting an alternative theory regarding when and from where Office Moody-Moore placed her calls). In support of its theory that the calls to Ms. Covington did not occur from

the desk in the middle of the unit, but rather from a separate office, the Government pointed to video footage of Officer Moody-Moore running into the office.  Trial Tr. 3112:25–3113:17, ECF No. 338 (Government's closing argument).

The Court does not find that Officer Moody-Moore's testimony about where she made her first phone call amounted to perjury.  Both Ms. Covington and the Government presented their theories of the case to the jury on the location and the timing of Officer Moody-Moore's first phone call to Ms. Covington before ultimately turning the question over to the jury to assess the credibility of the witnesses and weigh the evidence presented by both parties.  *Briscoe*, 101 F.4th at 299.

> *b. Moody-Moore's Notes*

Ms. Covington argues that Officer Moody-Moore clearly lied about taking contemporaneous notes on January 9, 2021.  Mot. New Trial 25.  Instead, Ms. Covington argues that the "contemporaneous notes" were a rough draft of the email that Officer Moody-Moore sent to SIA Norman.  *Id.*  Ms. Covington argues that the Government was aware of this falsity based on the Government's objection to the admission of Officer Moody-Moore's notes.  *Id.*  As the Government points out in its response, there is a reasonable explanation for the similarity between Officer Moody-Moore's notes and her e-mail to SIA Norman—that Officer Moody-Moore referenced her notes when she emailed SIA Norman.  Resp. Opp'n  14.

In this case, the Court would be inserting its own credibility determination over that of jury, if it were to find that Officer Moody-Moore lied about taking contemporaneous notes. Counsel for Ms. Covington cross examined Officer Moody-Moore and in doing so challenged the veracity of her notes and when Officer Moody-Moore took those notes.  Trial Tr. 1001:15–1002:23, 1003:23–1004:19, 1004:4–19, ECF No. 332.  Lastly, Ms. Covington made this exact

argument to the jury—that Officer Moody-Moore never took contemporaneous notes on January 9, 2021, and the Government's objection amounted to an admission that Officer Moody-Moore lied.  Trial Tr. 2971:6–2972:1 (Covington closing argument).  Therefore, the Court rejects Ms. Covington's argument that the Government sponsored perjured testimony because Ms. Covington "had an opportunity to challenge the credibility of these witnesses on cross examination," allowing "[t]he jury [to] hear[] the testimony, including the cross examination, [and] weigh[] the evidence, including the reliability of the witnesses," *Briscoe*, 101 F.4th at 299.

### c. Remaining Statements

The remainder of Ms. Covington's claims of perjury—Officer Moody-Moore's testimony about why she quit her job, Mot. New Trial 22; whether Moody-Moore met with Associate Warden Wilson, *id.* at 22–23; whether Moody-Moore knew that her memo got Ms. Covington "walked out," *id.* at 23; and Moody-Moore's impressions of W.W., specifically regarding whether W.W. needed a mood stabilizer, *id.*—are predicated on the testimony conflicting with Officer Moody-Moore's own prior statements or with the testimony of other witnesses.  Even accepting the highlighted conflicts as such, however, the Court notes that Ms. Covington cross-examined Officer Moody-Moore about her prior statements and about other witnesses' recollections.  *See* Trial Tr. 980:4–19, ECF No. 332 (Moody-Moore admitting "[she] may have said those words" about why she quit); *id.* at 981:11–20 (commenting that she does not recall meeting with Associate Warden Wilson); *id.* at 984:6–14 (noting that she does not recall stating that her e-mail got Ms. Covington walked out); *id.* at 986:21–987:6 (cross examination of Officer Moody-Moore on her assessment of W.W.).  As "credibility and reliability [are] for the jury to decide." *Briscoe*, 101 F.4th at 299 (specifically applying this rule to a claim of alleged use of perjured testimony, which was distinct from the court's Rule 29 analysis), the Court is satisfied that Ms. Covington "thoroughly cross-

examined" Officer Moody-Moore, thereby allowing "[t]he jury [to] hear[] the testimony, including the cross examination, [and] weigh[] the evidence, including the reliability of the witnesses," *Briscoe*, 101 F.4th at 299.

Because Ms. Covington has done nothing more than show that Officer Moody-Moore may have "credibility problems" or was otherwise "unreliable," she has not borne her heavy burden of showing that Officer Moody-Moore testified falsely. *Id.*

### 2. Special Agent Whitney

Ms. Covington argues that the Government also used false testimony from SA Whitney. Mot. New Trial 26. Specifically, that SA Whitney had never had the inspector general, Mr. Horowitz, reach out to her before, that she did not direct BOP employee Heather McWilliams to lie to Ms. Covington, and that Ms. Covington was not at the courthouse on June 7, 2023, for her initial appearance. *Id.* at 26–27. Ms. Covington argues that these identified false statements are material because SA Whitney was the case agent for the investigation and one of the two primary witnesses supporting the False Statement count against Ms. Covington. *Id.* at 28.[7]

With respect to Ms. Covington's first argument, that SA Whitney lied about June 7, 2023, being the first time an inspector general had reached out to her about a case, the Court does not find that these statements, even if accepted as false,[8] "create[d] a false impression of material fact." *Briscoe*, 101 F.4th at 298. Most particularly, it is not clear what false impression SA

---

[7] The Court takes note of Ms. Covington's request for a hearing regarding Special Agent Whitney's arrest plan, but denies that request. Reply 8 n.4. Ms. Covington does not present any case law to support her request, *see generally* Reply, and the Court does not see how any arrest plan would "create a false impression of material fact." *Briscoe*, 101 F.4th at 298. Indeed, Special Agent Whitney's personal conduct seems far removed from the question of whether or not Ms. Covington made false statements or acted with deliberate indifference.

[8] The Court only accepts this for purposes of abbreviating the analysis, noting that there was ambiguity in SA Whitney's testimony that "[she'd] never had Mr. Horowitz reach out to [her] on an investigation with the OIG," Trial Tr. 1499:2–3, ECF No. 333, insofar as this could *either* mean that he had never reached out to her, period, or never reached out to her on any *other* investigation. The latter of course leaves open the possibility—which we know to be fact—that he had emailed SA Whitney previously in connection with this very case. *See, e.g.*, May 22, 2023 E-Mail from Horowitz to Whitney, ECF No. 351-1 (███████████████).

Whitney's testimony created. The Defendant introduced the e-mail from Inspector General Horowitz to suggest to the jury that Mr. Horowitz's accolades contributed to SA Whitney's "pretty significant interest in the outcome of [the] case[.]" *See* Trial Tr. 1498:19–1499:15, ECF No. 333. If anything, the suggestion created by SA Whitney's testimony—that this was the very first time Mr. Horowitz had ever reached out to her—furthers the Defendant's argument on bias, i.e., that SA Whitney had "a personal interest in ensuring that she won this trial." Mot. New Trial 28–29. Absent some specific false impression of material fact identified by the Defendant, this testimony cannot serve as the basis for seeking a new trial.

Ms. Covington's second claim of perjury hinges on whether or not Special Agent Whitney asked BOP employee Heather McWilliams to lie to Ms. Covington. The Court does not find that Ms. McWilliams's testimony is altogether inconsistent with Special Agent Whitney's testimony. *Compare* Trial Tr. 1491:15–1493:18, ECF No. 333 (Whitney testimony that "I told her—I told them what we—they knew what we were planning on doing, that we needed to have Ms. Covington come into the institution."), *with* Trial Tr. 2198:1–2200:17, ECF No. 335 (McWilliams testimony that she called Ms. Covington "under the guidance of [SA] Whitney" but that SA Whitney did not instruct her to tell Ms. Covington that she needed to come to sign an affidavit or give any other specific pretext). Ms. Covington cross-examined both Special Agent Whitney, *see* Trial Tr. 1490:20–1494:17, ECF No. 333, and Ms. McWilliams on the matter, *see* Trial Tr. 2198:1–2204:21, ECF No. 335. Because Ms. Covington "had an opportunity to challenge the credibility of these witnesses on cross examination," allowing "[t]he jury [to] hear[] the testimony, including the cross examination, [and] weigh[] the evidence, including the reliability of the witnesses," *Briscoe*, 101 F.4th at 299, the Court rejects the Defendant's argument that the Government knowingly relied upon false testimony in this regard.

Lastly, with respect to SA Whitney's testimony that she "[did]n't believe [Ms. Covington came to the courthouse] to go to her initial appearance" on the day she was arrested, Trial Tr. 1495:7–10, ECF No. 333, the Court finds that the Defendant has not established that SA Whitney testified falsely on material facts. Specifically, while SA Whitney did push back against counsel for Ms. Covington's question[9] by responding "No, I don't believe to go to her initial appearance," Trial Tr. 1495:9, ECF No. 333, SA Whitney did wholly concede that (1) on the day of Ms. Covington's initial appearance, she came to the courthouse voluntarily, *id.* at 1494:21–23, and (2) Ms. Covington walked through the courthouse magnetometer voluntarily, *id.* at 1495:10. SA Whitney made clear that she wanted to "provide some context to" her understanding of Ms. Covington's arrival to the courthouse, and she stated that she knew Ms. Covington's lawyer had an office in the courthouse. *Id*. at 1495:1–13. She further conceded that Ms. Covington "could have been" coming to the courthouse in advance of her initial appearance to meet with her lawyer. *Id*. at 1495:24–25. Based on the foregoing, the Court finds that SA Whitney's statement about her own belief of why Ms. Covington walked through the magnetometer amounts more to "confusion" or a "mistake," rather than "the willful intent to deceive." *Roberts v. Clarke*, 2021 WL 1876131, at *9 (E.D. Va. May 10, 2021) (quoting *Horton v. United States*, 983 F. Supp. 650, 657 (E.D. Va. 1997)). And again, the statements Ms. Covington now challenges were elicited on cross examination, not by the Government in the course of direct examination, and to that extent they were fair game for the jury's ultimate credibility determination. *Briscoe*, 101 F.4th at 299. In sum, the Defendant has not borne her "heavy burden" of showing that SA Whitney testified falsely in this context. *Id*. at 298.

---

[9] "She walked through the magnetometer to go to her initial appearance, correct?" Trial Tr. 1495:7–8, ECF No. 333.

3. <u>Special Investigative Agent Norman</u>

Ms. Covington next argues that there were two instances where the Government failed to correct SIA Norman's false testimony.  Mot. New Trial 29.  First, that SIA Norman lied about why he contacted Officer Moody-Moore, several months after W.W's death.  *Id.* at 29–30.  Second, that SIA Norman lied about the day he talked to Ms. Covington immediately following W.W.'s death and he lied about asking her to write a report.  *Id.* at 29–30.  This testimony is purportedly proven false by contrary evidence in the record, specifically the sworn statement of Associate Warden Wilson and the report created by Brandi Reynolds, documenting the BOP staff interviewed following W.W.'s death, and by SIA Norman's own testimony on cross.  *Id.* According to Ms. Covington, SIA Norman lied so that the investigation did not look like a witch hunt against Ms. Covington.  *Id.* at 30.

The first claim of perjury with respect to SIA Norman fails because the testimony Ms. Covington now challenges was elicited on cross examination and, while the cross may have revealed some inconsistencies in SIA Norman's testimony, it did not amount to clear perjury such that the Government was obliged to correct it.  *See* Mot. New Trial 29 (citing Trial Tr. 1157–1158 (Bruce Norman cross examination testimony)); *cf. Griley*, 814 F.2d at 971 ("The government does not have to solicit the false evidence; it is enough if the government allows the evidence to go uncorrected when it surfaces." (citing *Napue*, 360 U.S. at 269)).  The Court finds that Ms. Covington had full opportunity to impeach SIA Norman with the information she now offers as proof of his false testimony, or to solicit this contradictory information from other witnesses; whether or not such opportunity was fully utilized, the fact of the opportunity remains.  Beyond that, "credibility issues and contradictions are not equivalent to false testimony."  *Briscoe*, 101 F.4th at 299.  The evidence cited by the Defendant does not in and of itself render SIA Norman's

25

statements false, as the record evidence does not preclude either inconsistencies in parties' recollections and records or that certain parties may very well have "spoke[n]" without such conversation constituting an "interview." *See* Mot. New Trial 29 (juxtaposing excerpted SIA Norman testimony against proposed contradictory evidence). Without more information or corroboration for her interpretation of the proffered exhibits and/or SIA Norman's testimony, the Defendant has not met "'the heavy burden of showing that [SIA Norman] testified falsely." *Briscoe*, 101 F.4th at 298.

As to whether SIA Norman lied about the date on which he spoke with Ms. Covington, "[i]t is unclear what more the government could or should have done to correct the [alleged] false testimony once [SIA Norman]" admitted that he may have gotten the dates wrong. *United States v. Chavez*, 894 F.3d 593, 601 (4th Cir. 2018); Trial Tr. 1142:14–15, ECF No. 332 ("That's a possibility[;] I could have gotten my days wrong."). And, as to whether "[SIA] Norman lied about asking Ms. Covington to prepare a report" during any such investigatory meeting, Mot. New Trial 30–31, while Ms. Covington argues that "the evidence demonstrates that [he] lied," she offers nothing beyond circumstantial evidence regarding the consequences Ms. Covington would have faced had she disregarded such a request and been disciplined for it, and that SIA Norman did not ask other individuals to prepare reports, *id.* at 31. Regardless, Ms. Covington had sufficient opportunity to cross-examine SIA Norman about this issue and to argue SIA Norman's credibility in closing. As such, the Court is satisfied that the jury had the ability to "weigh[] the evidence, including the reliability of the witnesses" based on the testimony, which included cross examination. *Briscoe*, 101 F.4th at 299; *see also* Trial Tr. 2976:13–2977:16, ECF No. 338 (Covington closing argument addressing how SIA Norman "told [the jury] a whole story about a conversation that he had with Ms. Covington on Monday, January 11, 2021."). Ms. Covington

26

has again not carried her burden to establish that the Government knowingly relied on false testimony by SIA Norman.

4. Dr. Biber

Ms. Covington argues that Dr. Biber perjured herself by falsely stating that she did not know whether W.W. was dead when she wrote her suicide assessment report. Mot. New Trial 31–32. Ms. Covington argues that the Government not only allowed perjured testimony but prevented Dr. Raasch from testifying about Dr. Biber's prior inconsistent statement. *Id.* at 32. Ms. Covington argues that Dr. Biber's false testimony "certainly impacted the verdict, which is why [the Government] stepped in to protect her." *Id.*

The Court is not convinced that Dr. Biber committed perjury in this case. As the Government points out, and as Dr. Biber testified, as of the conclusion of her conversation with Dr. Young, W.W. had not been officially declared deceased, Am. Resp. Opp'n 23; Trial Tr. 1355:18–1356:23, ECF No. 333, but that, by the time she spoke to Dr. Raasch, Dr. Biber assumed that W.W. was dead, Trial Tr. 1365:6–20; 1366:4–17. Dr. Biber stated that she did not include her assumption that W.W. was dead in the suicide risk assessment because she "didn't known for sure" that W.W. was dead. *Id.* at 1366:10–17. While Ms. Covington now contends that the Government allowed Dr. Biber to falsely testify about her knowledge of W.W.'s death, Mot. New Trial 32, the Court recognizes that there is a distinction between an inmate being declared dead officially and assuming that an inmate is dead, as Dr. Biber repeated multiple times. *See* Trial Tr. 1355:25–1356:1, 1359:14–15, 1365:6–20, 1366:4–17, ECF No. 333. This distinction is nuanced, but a review of Dr. Biber's testimony does not reveal that she perjured herself or that the Government relied on perjured testimony in this regard. *See id.*

27

Finally, the Court rejects the Defendant's argument that the Government "objected to prevent witness Jessica Raasch from informing the jury of Dr. Biber's prior inconsistent statement," i.e., that Dr. Biber did not tell Dr. Raasch that W.W. was dead. Mot. New Trial 32 (citing Trial Tr. 2513:23–2514:9, ECF No. 336). All parties were equally bound by the Federal Rules of Evidence in conducting the trial and their examinations of the witnesses; the Court does not impart any nefarious motive upon the Government merely for raising a proper hearsay objection. More importantly, after this objection was raised and sustained, Ms. Covington's own counsel was able to cross-examine Dr. Raasch in a manner that elicited the same general information, without drawing a hearsay objection, and this testimony *was* properly allowed. Trial Tr. 2515:7–19 ("Q: When you arrived to the institution [after your phone call with Dr. Biber], did you expect to interview Mr. Walters? A: I did not. Q: Why not? A: Because I was under the impression he was deceased.").

The Court finds that, semantics of assumed death versus reported death aside, Ms. Covington was able to expose the purported inconsistency in Dr. Biber's testimony to the jury, who could then "weigh[] the evidence, including the reliability of the witnesses," in deciding whether to convict Ms. Covington. *Briscoe*, 101 F.4th at 299. Thus, a new trial is not merited on account of Dr. Biber's testimony.

5. Associate Warden Wilson

The Defendant next argues that Associate Warden Wilson perjured himself by misrepresenting BOP policies and the role that he played in promoting Lieutenant Arkin. Mot. New Trial 32–33. Specifically, Wilson represented that lieutenants were required under BOP policy to do rounds, while Ms. Covington argues that BOP policy dictates that *either* an activities lieutenant or an operations lieutenant may conduct daily rounds. *Id.* at 32. Ms. Covington also

28

argues that Wilson improperly presented "when in doubt, send them out" as BOP policy, when it was not. *Id.* at 32–33. Lastly, Ms. Covington argues that Wilson perjured himself when he denied that he promoted Ms. Arkin to lieutenant. *Id.*

First, the Court is not persuaded that Wilson's statement about rounds was false. Wilson stated that, per BOP policy, "lieutenants" are required to do rounds in the housing units at least once during their shift. Trial Tr. 607:1–3, ECF No. 331. He did not testify that *operations* lieutenants are the only staff members who could satisfy this requirement; rather, he agreed on cross that if an activities Lieutenant completed rounds during the shift, that would satisfy BOP policy. *Id.* at 692:3–12. Wilson's statements regarding rounds, when taken in their entirety, do not rise to the level of perjury.

With respect to Associate Warden Wilson's phrase, "when in doubt, send them out," "[i]t is unclear what more the government could or should have done to correct the [alleged] false testimony once [Wilson]" agreed on cross that "when in doubt, send them out" was his own maxim and not BOP policy. *See Chavez*, 894 F.3d at 601; Trial Tr. 698:2–699:3, ECF No. 331. Therefore, the testimony on this point as a whole did not create a false impression of material fact. *Briscoe*, 101 F.4th at 298.

Finally, the Court agrees with the Government that Associate Warden Wilson's testimony that he did not himself promote Lieutenant Arkin, *see* Trial Tr. 727:19–25, did not create a false impression of material fact. The sworn statement Ms. Covington presents as "proof" that Wilson lied on this point simply supports the fact that he had a role in reviewing her candidacy and application for lieutenant and that he thought she was qualified for the position. *See* Mot. New Trial Ex. J 15–18, ECF No. 351-10. The statement does not contradict Wilson's testimony that he did not participate in the ultimate promotion decision. But even assuming *arguendo* that the

Court found that Wilson did lie on this point, Ms. Covington has failed to persuade the Court that such a fact "could have affected the judgment of the jury" with respect to determining Ms. Covington's ultimate culpability. *Davis*, 74 F.4th at 211–12 (quoting *Agurs*, 427 U.S. at 103). As much as the Defendant would like to make this case about the failings of Lieutenant Arkin or any other BOP employee, the jury was clearly instructed that its role was only to determine the guilt or innocence of the defendants presently before it and not that of any other person. Jury Instr. 11, ECF No. 317. As such, the testimony with respect to Lieutenant Arkin's promotion was not material to the ultimate question before the jury, i.e., whether Ms. Covington was guilty of deliberate indifference and/or false statements.

### 6. Dr. Young's Phone Records

Lastly, Ms. Covington contends that the Government relied on false evidence when cross-examining Nurse Woolridge. Mot. New Trial 34–35. Ms. Covington argues the evidence presented, i.e., phone records and Nurse Woolridge's clinical encounter form, indicates Nurse Woolridge called Dr. Young after her encounter with W.W., and therefore it was "Constitutionally unsound" for the Government to suggest otherwise in front of the jury. *Id.*

The Government agrees that the phone records demonstrate that Dr. Young received a phone call from FCI Petersburg on January 9, 2023, but disputes whether the evidence supports—let alone establishes—that it was Nurse Woolridge calling Dr. Young about W.W. Am. Resp. Opp'n 26. The Government gives four reasons in support of its position. First, the Government points out that Nurse Woolridge did not remember calling Dr. Young that day. *Id.* (citing Trial Tr. 1933:10–1934:11). Second, Nurse Woolridge admitted that falsely marking down that she had called the doctor in her clinical encounter would qualify as a false entry. *Id.* (citing Trial Tr. 1935:10–13). Third, Dr. Young testified that she did not recall any particular calls she received

that day. *Id.* (citing Trial Tr. 1587:10–12). And lastly, the phone call made to Dr. Young was over an hour and a half after Nurse Woolridge's encounter with W.W., undermining the claim (according to the Government) that the 9:48 A.M. call had in fact been Nurse Woolridge calling about W.W. *Id.*

The Court finds no reliance on false evidence in this context. The Government was entitled to cross a defense witness on its theory of the case, even where that theory was predicated on an interpretation of the record evidence with which Ms. Covington clearly disagrees. And contrary to the Defendant's assertion in the Motion for New Trial, the prosecution did not "double down on [the] misrepresentation" that *no* call to Dr. Young occurred, when phone records demonstrated otherwise; rather, the prosecution challenged simply whether the single call to Dr. Young that occurred between Nurse Woolridge's interaction with W.W. and her submission of her Clinical Encounter Form was in fact placed by Nurse Woolridge. Accordingly, the Court finds no falsity sponsored by the Government in the course of this cross examination.

7. Cumulative Effect

Finally, Ms. Covington argues that a new trial is warranted based on the cumulative effect of the Government's use of perjured testimony. *Id.* at 35 (citing *United States v. Ellis*, 121 F.3d 908 (4th Cir. 1997)). Because the Court has found no perjury, the Court is unpersuaded as to this final argument. Further, the Court is satisfied that Ms. Covington's cross-examinations and closing argument, along with those performed by her co-defendants, put the various witnesses' credibility on full display before the jury. Therefore, the Court does not find that the testimony-contradicting evidence presented by Ms. Covington in the present Motion "weighs so heavily against the verdict that it would be unjust to enter judgment." *Millender*, 970 F.3d at 531 (quoting *Arrington*, 757 F.2d at 1485).

31

### C. Prosecutorial Misconduct During Closing Argument

Ms. Covington next contends that two forms of prosecutorial misconduct occurred during closing argument. *See* Mot. New Trial 36–37. First, that the Government improperly appealed to the sympathy and prejudices of the jury. *Id.* at 36–39. Next, that the Government misrepresented facts to the jury in order to buttress the credibility of Officer Moody-Moore. *Id.* at 36, 39–41. The Government disagrees, claiming that its closing arguments accurately reflected the facts in the case as they related to Ms. Covington. *See* Am. Resp. Opp'n 28–31. The Government also notes that it encouraged the jury to consider all of the evidence during the deliberations and even highlighted weaker aspects of Officer Moody-Moore's testimony, such as how she did not remember which phone she used to called Ms. Covington. *Id.* at 31–32.

To evaluate whether comments made during a closing argument are prejudicial to the point of requiring a mistrial, courts in the Fourth Circuit consider six factors. *United States v. Beeman*, __ F.4th __, 2025 WL 1141866, at *6 (4th Cir. 2025). These are:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters; (5) whether the prosecutor's remarks were invited by improper conduct of defense counsel; and (6) whether curative instructions were given to the jury.

*Id.* (quoting *United States v. Wilson*, 624 F.3d 640, 656–57 (4th Cir. 2010)). "These factors are to be viewed in the context of the trial as a whole, 'and no one factor is dispositive.'" *Id.* (quoting *United States v. Lighty*, 616 F.3d 321, 361 (4th Cir. 2010)).

#### 1. Appeal to Sympathy and Prejudices of the Jury

Ms. Covington argues that the Government's closing was designed to inflame the passion of the jury so that the jury based its decision on emotion rather than the facts presented. Mot. New Trial 37. Referring back to her pretrial Motion in Limine, ECF No. 102, Ms. Covington argues

that the prejudicial spillover that took place during trial—particularly with respect to testimony and evidence concerning the state of W.W. long after Ms. Covington's shift ended and she departed the prison—is exactly why she previously asked for a separate trial.  Mot. New Trial 37–39; Reply 10–12.  She reiterates some of her arguments from her Motion in Limine, e.g., that but for co-defendant Yolanda Blackwell, the Government would not have been able to present or rely on inflammatory evidence like the suicide watch video.  Reply 11.  Lastly, Ms. Covington contends that she cannot and should not be held accountable for injuries that took place after she left or for injuries that occurred while W.W. was on suicide watch, as she was not responsible for placing W.W. on suicide watch.  *Id.* at 10–12.

The Government counters that there was no hyperbole in its closing argument and that every symptom listed was directly supported by the record.  Am. Resp. Opp'n 28–30.  It further notes that there was ample evidence that W.W. sustained injuries while Ms. Covington was on shift and that the prosecution did not suggest that the jury should attribute other Defendants' deliberate indifference to Ms. Covington.  *Id.* at 30.  The Government agrees that Ms. Covington played no role in placing W.W. on suicide watch and never suggested that she did.  *Id.* at 30–31.

First, the Court agrees that the language used by the prosecutor was supported by the record and thus was not improper.  *See, e.g.*, Trial Tr. 777:22–23, ECF No. 331 (Southerland testimony that "[W.W.] was unresponsive and couldn't talk."); *id.* at 772:18–775:2 ("Sometimes it was just a simple fall, like, on his butt and then bounce back up.  A couple times he fell, like, face forward and hit his face on the locker and -- pretty bad fall"); Trial Tr. 1082:16, ECF No. 332 (Pryor testimony describing W.W. "stumbling and off balance"); *id.* at 958:8–9 (Moody-Moore testimony that "I did find out that it was possible urine on the floor."); Trial Tr. 456:22–457:5, ECF No. 330 (Dr. Berry testimony that "[W.W.] just had bruising, it looked like, kind of all over his -- the front

of his body"); *id.* at 473:1–9 (describing two skull fractures); *id.* at 476:17–478:2 (noting that "the ligament itself [in W.W.'s neck] was torn"); *id.* at 478:6–18 (describing W.W.'s brain bleed). Key to the Court's assessment is Mr. Southerland's testimony that these symptoms were present "during the night and throughout the next day," Trial Tr. 775:3–7, ECF No. 331, which was corroborated by Officers Moody-Moore, Barnes, and Pryor. *See, e.g.*, Trial Tr. 965:12–21, ECF No. 332; *id.* at 890:7–8, *id.* at 1082:21–24.

With respect to Ms. Covington's arguments about prejudicial spillover, the Court largely relies on its prior determination that Ms. Covington's substantial rights were not so prejudiced by the introduction of suicide watch-related evidence as to deprive her of a fair trial. *See* Mot. Limine Mem. Op., *United States v. Covington*, 2024 WL 707388 (E.D. Va. Feb. 20, 2024), ECF No. 132; *see also United States v. Chong Lam*, 677 F.3d 190, 203 (4th Cir. 2012) ("A prosecutor's statements at trial constitute reversible error only if they were (1) improper and (2) 'prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.'" (quoting *United States v. Chorman*, 910 F.2d 102, 113 (4th Cir. 1990)). This Court previously addressed Ms. Covington's concerns about the relevance and prejudice of the suicide watch videos of W.W. In short, the Court held that the suicide watch video would have been admissible as to Ms. Covington regardless of Ms. Blackwell being a part of the case. *See Covington*, 2024 WL 707388, at *4 ("Though the suicide watch evidence may not, on its own, conclusively prove all of the essential elements of the offenses Defendant[] Covington . . . face[s], the evidence is still relevant under the Federal Rules."). The Court further noted that any arguments Ms. Covington made "about having left the prison before the collection of this evidence [were] forceful ones to make to the jury about whether any reasonable doubt remains as to their guilt, not about admissibility of the suicide watch evidence in the first instance." *Id.* "In other words, the Defendants' arguments

go to what *weight* the jury should ascribe to this evidence, not to this evidence's overall relevance in this case." *Id.* "And where such evidence is relevant and probative, as is the case here, the Fourth Circuit has often 'found the admission of gruesome and shocking [evidence] not to be unfairly prejudicial.'" *Id.* at *5 (quoting *United States v. Bullis*, 139 F.3d 893 (4th Cir. 1998)). As the Court previously found, it does so again, being "not satisfied that the suicide watch video evidence [would] "lur[e] the jury 'into declaring guilt on a ground different from proof specific to the offense[s] charged.'" *Id.* (quoting *Bullis*, 139 F.3d 893).

Finally, the Court notes that it instructed the jury to "give separate and individual consideration to *each* charge against *each* Defendant," Jury Instr. 9., ECF No. 317 (emphasis added), and instructed the jury that "[q]uestions, objections, statements, and arguments of counsel are not evidence in the case." Jury Instr. 3. Since the "juries are presumed to follow their instructions" the Court presumes that the jury did just that. *Chong Lam*, 677 F.3d at 204 (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

Based on the foregoing, the Court does not find that the Government's recitation of evidence was improper or otherwise bore a tendency to mislead the jury and prejudice Ms. Covington, nor were they a diversion to extraneous matters. *Beeman*, __ F.4th __, 2025 WL 1141866, at *6. This, coupled with the individualized-consideration instruction given to the jury, leads the Court to conclude that the "inflammatory" comments at closing were not so prejudicial as to require a new trial. *Id.*

2. Misrepresented Facts in Closing Argument

Next, Ms. Covington argues that the Government falsely represented in closing that Officer Moody-Moore's first call was not made from the blue desk in the unit but was instead made from the office at some later time outside the view of the camera. Mot. New Trial 39–41. Ms.

Convington argues that the Government's representation is inconsistent with Officer Barnes's testimony, and as a result it is improper and thus warrants a new trial. *See id.* at 39, 41; Reply 12–13.

The Government contends that Officer Barnes's testimony and video footage do not "unequivocally" demonstrate where the first phone call took place. Am. Resp. Opp'n 31–32. The Government notes that Officer Barnes did not overhear the conversation between Officer Moody-Moore and Ms. Covington, and therefore Officer Barnes's testimony about where Officer Moody-Moore made the first call is only her opinion of when the call took place. *Id.* at 31. Regardless, the Government points out that during closing, it highlighted that while Officer Moody-Moore did not know which phone she used, ultimately the key issue was that Officer Moody-Moore called Ms. Covington twice about W.W., informed Ms. Covington of his symptoms, and asked Ms. Covington for help. *Id.* at 31–32 (citing Trial Tr. 3112:25–3113:17, ECF No. 338).

The Court previously addressed the false or misleading information regarding what phone Officer Moody-Moore used to call Ms. Covington, *supra* Part III.B.1[a]. Although Ms. Covington argues that it is error for the Government to bolster or vouch for its own witnesses, that is not what happened in this case. *See* Mot. New Trial 40–41; *United States v. Huskey*, 90 F.4th 651, 671–72 (4th Cir. 2024) ("Vouching generally occurs when the prosecutor's actions are such that a jury could reasonably believe that the prosecutor was indicating a personal belief in the credibility of the witness." (quoting *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir. 1993))). Rather than "indicat[ing] a personal believe in the credibility or honesty of a witness," the prosecutor in this case simply suggested that the jury look at video footage when making a determination. *See, e.g.*, Trial Tr. 3112:25–3113:17, ECF No. 338. And even if the Court were to accept Ms. Covington's position that the Government's remarks had a tendency to mislead the jury, the Court would

36

nevertheless deny a new trial on basis of such remarks because the Court gave four separate instructions admonishing that it was the jury's duty to judge the credibility of each witness appropriately.    Jury Instrs. 17 (Credibility of Witnesses—Generally), 19 (Credibility of Witnesses—Prior Inconsistent Statement), 20 (Credibility of Witnesses—Felony Conviction), 21 (Credibility of Witnesses—The Defendant as a Witness).  The Court otherwise gave fulsome instructions to the jury on the underlying charges.  Again, since the "juries are presumed to follow their instructions," *Chong Lam*, 677 F.3d at 204, the Court presumes that the jury did just that, and that these instructions were sufficient to outweigh any purported prejudice from the statements regarding Officer Moody-Moore's phone usage in closing.

For the reasons stated above, and considering the purported misstatements in the context of the entire trial, *see Beeman*, __ F.4th __, 2025 WL 1141866, at *7, the Court finds no prejudice to Ms. Covington from the closing arguments and therefore will not grant a new trial on this ground.

**D.  Personal Animus Towards Ms. Covington**

Finally, Ms. Covington argues that the Court should consider the prosecution team's treatment of Ms. Covington throughout the investigation, specifically during her arrest, as proof of the prosecution team's personal animus towards Ms. Covington, and that such animus is grounds for a new trial because it permeated the first trial, "making it profoundly unjust and unfair." *See* Mot. New Trial 43, 48.  Ms. Covington highlights that Special Agent Whitney reached out, via a BOP employee, to Ms. Covington, despite the Defendant having been appointed legal counsel.  *Id.* at 43–45.  Ms. Covington goes on to argue that the prosecution team violated Ms. Covington's Sixth Amendment Right to Counsel, the U.S. Attorney's Manual, Rules of Professional Responsibility (both the ABA and Virginia Rules), United States District Court

protocol, and the United States Justice Manual. *Id.* at 46. Ms. Covington argues that the Government went through all these extreme measures just to arrest her and in doing so violated both the letter and the spirit of the law. *Id.* at 46–47; Reply 14. She further asserts that the Government's obvious disdain for her is illuminated by the Department of Justice's post-trial press release, which "falsely represented to the world that [Ms.] Covington caused W.W.'s death," her acquittal on the "resulting in death" prong of the § 242 charge notwithstanding. *Id.* at 47–48.

The Government disagrees and argues that Ms. Covington's arguments are factually unsupported and fail to explain how any animus would be material to the jury's finding of guilt, and therefore cannot serve as the basis for a new trial. Am. Resp. Opp'n 32–33. The Government also notes that Ms. Covington does not cite any case law or make any argument about the legal significance of the claimed animus. *Id.* Ms. Covington's argument regarding the prosecution team's ability to contact representing parties under the Professional Rules of Conduct and Department of Justice Policies fails to account for the exceptions to those rules. *Id.* at 33. Namely, the law does not require law enforcement officers to notify anyone who is represented prior to their arrest. *Id.* Next, the Government contends that the press release may have been inartful but does not suggest personal animus against Ms. Covington, as it aligns with the Government's theory of the case. *Id.* at 33–34.

The Court agrees that Ms. Covington fails to present a legal basis for the Court to grant a new trial on her argument. And even if the Court found that the prosecution *has* demonstrated personal animus against Ms. Covington, it is not clear to the Court how granting a new trial would remedy this issue. There is no evidence that the Government would appoint new counsel to the prosecution team or that a different case agent would testify, given that the BOP/OIG investigation is long since closed. More importantly, the Defendant does not explain how the fact of any such

animus calls into question the jury's finding of guilt. Indeed, Ms. Covington already explored the nature of the investigation thoroughly during the trial and highlighted both such nature and the actions of Special Agent Whitney at length. *See, e.g.*, Trial Tr. 1492:3–1496:11, ECF No. 333 (cross examination of SA Whitney); Trial Tr. 2979:16–2982:9, ECF No. 338 (Covington closing argument, telling the jury: "[I]f you need any proof of [Special Agent Whitney's] personal animus towards Ms. Covington all you need to do is think about the facts and the circumstances that you learned about the way Special Agent Whitney treated Ms. Covington when she arrested her in this case . . . . It is very clear from her treatment of Ms. Covington that this case is personal for Special Agent Whitney."). Clearly, the jury was already informed of Ms. Covington's theory of personal animus, yet came to the verdict it did, regardless.

For those reasons, the Court does not find that any animus so infected the trial with unfairness that a new trial is warranted. *See Ellis*, 121 F.3d at 928 (quoting *United States v. Loayza*, 107 F.3d 257, 262 (4th Cir. 1997)).

**E. Adoption of Co-Defendant Farley's Arguments in Support of New Trial**

In her Motion to Adopt, ECF No. 350, Ms. Covington adopted the arguments raised in Defendant Farley's Motion for Judgment of Acquittal and New Trial "in support of [Ms. Covington's] motion for new trial[,] as such arguments apply equally to the unjust jury verdicts related to Ms. Covington." *Id.* at 1. Ms. Covington did not endeavor to personalize or otherwise elaborate upon Ms. Farley's arguments for a new trial in subsequent briefing. Therefore, the Court rests on the analysis in its Memorandum Opinion denying Ms. Farley's Motion for Judgment of Acquittal and New Trial, *see* Mem. Op. Farley Mots., ECF No. __ (issued contemporaneously herewith), and denies Ms. Covington's request for a new trial to the extent it is premised on those same grounds.

## IV.  CONCLUSION

For the reasons stated above, the Court does not find that the "evidence weighs so heavily against the verdict that it would be unjust to enter judgment."  *Millender*, 970 F.3d at 531 (quoting *Arrington*, 757 F.2d at 1485).  Therefore, the Court denies Ms. Covington's Motion for a New Trial.

/s/ _____

Roderick C. Young
United States District Judge

Date: May 19, 2025
Richmond, Virginia